N.A.A.C.P., Detroit Branch; The Guardians, Inc.; Brady Bruenton; Cynthia Martin; Hilton Napoleon; Sharron Randolph; Betty T. Roland; Grant Battle; Cynthia Cheatom; Evin Fobbs; John Hawkins; Helen Poelinitz; on behalf of themselves and all others similarly situated, Plaintiffs,

v.

DETROIT POLICE OFFICERS ASSOCIATION (DPOA); David Watroba, President of the DPOA; City of Detroit, a Michigan Municipal Corporation; Mayor Coleman A. Young; Detroit Police Department; Board of Police Commissioners; Chief William Hart; Governor William Milliken; and The Michigan Employment Relations Commission, Defendants.

Civ. A. No. 80–73693.

United States District Court, E.D. Michigan, S.D.

July 25, 1984.

Thomas I. Atkins, Brooklyn, N.Y., Barnhart & Mirer by Jeanne Mirer, Gary Benjamin, James W. McGinnis, Detroit, Mich., for plaintiffs.

Walter S. Nussbaum, Mara Kalnins-Ghafari, Detroit, Mich., for defendants Detroit Police Officers Association, David Watroba, President of DPOA.

Frank W. Jackson, Asst. Corp. Counsel, Detroit, Mich., Daniel B. Edelman, Washington, D.C., Terri L. Hayles, Asst. Corp. Counsel, Detroit, Mich., for defendants City of Detroit, Mayor Coleman A. Young, Detroit Police Department Board of Police Commissioners, Chief William Hart.

## OPINION

GILMORE, Judge.

Can the City of Detroit, knowing full well that by laying off a large number of black police officers it breached its affirmative obligations in violation of the Fourteenth Amendment, fail to return these officers to work? This is one issue presented in this case, and the answer is clearly no.

Did the Detroit Police Officers Association fail to take reasonable efforts to protect these black members in connection with the layoffs and thus breach its duty of fair representation to them? This is the second major issue presented here, and the answer is clearly yes.

### I

The action was brought by the Detroit Branch of the NAACP, The Guardians, Inc., and ten named individual black police officers against the City of Detroit, its Mayor, its Police Department, its Police Commissioners, its Police Chief, the Detroit Police Officers Association (DPOA), and David Watroba, President of the DPOA. Early in the proceedings, the Court certified a class of all black police officers laid off in 1979 and 1980.[1]

Plaintiffs contend that the City violated affirmative duties imposed by prior findings of constitutional violations in *Baker v. Detroit*, 483 F.Supp. 930 (E.D.Mich.1979),

---

**1.** The Governor of Michigan and the Michigan Employment Relations Commission were originally defendants, but were dismissed on motion early in the case.

*aff'd sub nom Bratton v. Detroit,* 704 F.2d 878 (6th Cir.), *modified* 712 F.2d 222 (6th Cir.1983), *cert. denied* — U.S. ——, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). Plaintiffs also contend the City defendant violated 42 U.S.C. §§ 1981, 1983, and 1985(3), and that their Thirteenth Amendment rights were denied by the City.

Plaintiffs further claim the DPOA has breached its duty of fair representation under Michigan law, and has violated 42 U.S.C. §§ 1981, 1983 and 1985(3), and the Thirteenth Amendment.

Full trial of the matter began on May 23, 1984, and continued through 21 days and 2,612 pages of transcript.

At issue is the layoff of approximately 1,100 Detroit police officers below the rank of sergeant, approximately 75 percent of whom were black. As a result of a budgetary crisis, the City, in 1979, implemented large-scale layoffs of City employees, including police officers. On October 13, 1979, the City laid off 400 police officers, of whom 71 percent were black, and in 1980 an additional 690 police officers were laid off, 75 percent of whom were black. All officers were laid off pursuant to Article 10(e) of the collective bargaining agreement between the City and the DPOA that required seniority be strictly applied in the event of layoffs, with the result that those last hired were first to be laid off.

In *Baker, supra,* Judge Keith found that the City of Detroit had engaged in intentional racial discrimination in its police department, at least until 1968. *Baker* found, and testimony at trial also revealed, that the City of Detroit did not seriously begin its efforts to eliminate the effects of its past racial discrimination until the

1970's. On July 31, 1974 the City adopted an affirmative action program for its police department, involving hiring and promotions in the Detroit Police Department. This affirmative action program has been upheld by the Sixth Circuit in *Bratton, supra,* and *DPOA v. Young,* 608 F.2d 671 (6th Cir.1979), *cert. denied* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981).

The affirmative action program resulted in an accelerated hiring rate for blacks in the Detroit Police Department. In 1975, out of 393 appointments to the Detroit Police Department, 250, or 63 percent, were black. In 1976 there were no appointments. In 1977, out of 1,245 appointments, 949, or 76 percent, were black, and in 1978, the last year in which hiring has taken place in the Detroit Police Department, out of 227 appointments, 179, or 78 percent, were black.

On December 31, 1978 blacks held 1,719 of 4,393 positions in the rank of police officer, or 39.1 percent, and 1,946 of the total of 5,630 positions in the department, or a total of 34.6 percent. This figure represents the highest percentage of blacks ever in the Detroit Police Department.[2] On February 23, 1984, when this Court issued its partial summary judgment ruling, the Detroit Police Department had a total sworn personnel of 3,762, of which 1,007, or 26 percent, were black. It had a total of 2,668 police officers, of whom 756, or 28 percent, were black. Thus, it is clear that the net effect of the layoffs in 1979 and 1980 was to wipe out most of the affirmative action recruiting that had brought large numbers of blacks onto the police force in 1977 and 1978.[3]

2. At least since 1966, when the DPOA was made exclusive bargaining representative, all sworn Detroit officers below the rank of sergeant have been members of the DPOA. Thus, statistics for officers below the rank of sergeant kept by the City of Detroit should also be applicable to the DPOA.

3. On August 12, 1981, the Detroit Police Department recalled 100 officers, and during the period from April 12, 1982 through June 8, 1982 recalled an additional 171 officers. However,

further layoffs took place on September 10, 1983, when 224 police officers were laid off. This effectively wiped out most of the recalls of 1981 and 1982.

On June 18, 1984, the Detroit Police Department recalled 135 police officers, of whom 111, or 82.2 percent, were black. Further recalls are anticipated by the Detroit Police Department once the present contract, which is in arbitration under Act 312, is determined.

At trial, Dr. Mark Bendick, Jr.,[4] an economist, updated the statistical figures established by Allen Fechter in *Baker*.[5] These statistics, which show the disparity between the number of blacks in the Detroit Police Department and the numbers of blacks in the relevant labor market, can only be explained, according to both Fechter and Bendick, by racial discrimination in hiring. Bendick, in updating Fechter's work, testified at trial that, if the Detroit Police Department had hired police officers in proportion to the black representation in the relevant labor pool from 1945 to 1978, the black representation at the police officer rank as of December 31, 1978 would have been approximately 47.7 percent, rather than 39.1 percent. His analysis also revealed that, as of April 30, 1980, the black representation at the police officer level would have been approximately 43.8 percent rather than the 28.3 percent. Dr. Bendick made a projection for 1988, and indicated that, if the Detroit Police Department had hired blacks in proportion to their labor market representation in all of the years from 1945 to 1978, the presence of black officers in 1988 would be 50.5 percent. As of 1984, blacks comprised 65 percent of the relevant labor market, and the City of Detroit is 67 percent black.

This description of the effects of racial discrimination on the Detroit Police Department, and the efforts of the City of Detroit to correct its past racial discrimination, cannot be traced without mentioning the police officers' unions. It is a matter of public record that both the Lieutenants and Sergeants Association in *Baker, supra,* and the DPOA in *DPOA v. Young, supra,* brought court challenges to the City's affirmative action plan. The public record, as well as testimony at this trial, indicates that, at least where affirmative action for blacks was concerned, the police unions, including the DPOA, were bitter opponents of the City. Testimony at trial indicated that the DPOA opposed efforts by the City to hire increased numbers of blacks and opposed the City's residency requirement— that all personnel in the Detroit Police Department have their residency in the City of Detroit, a requirement which, although not directly racial, has clear racial implications given the racial composition of the City of Detroit.

The first collective bargaining agreement between the DPOA and the City of Detroit was entered into in 1967. A seniority clause was bargained in at that time, and this clause has remained in effect in all agreements since. Several contracts have been entered into since then, but the parties were unable to agree to a contract in 1977, and in 1978 the impasse was referred to arbitration under Public Act 312 of 1969, M.C.L.A. § 423.231 et seq.[6] On December 30, 1978, the Act 312 Arbitration Board made its award on economic proposals. This award was challenged by the City in the courts, and was finally affirmed by the Michigan Supreme Court on June 6, 1980. *City of Detroit v. DPOA*, 408 Mich. 410, 294 N.W.2d 68 (1980).

The 1978 Act 312 award plays an important role in the underlying factual scenario

---

**4.** The Court will adopt Dr. Bendick's method of calculating the shortfall of blacks in the police officer ranks, and in all sworn positions at designated points in time, because his analysis is identical to the method used by Mr. Fechter in *Baker, supra.* It will disregard the testimony of Dr. Joe Darden, who was hired as an expert for the plaintiff, because his method of calculation was not identical to the method used by Fechter.

**5.** The figures established by Mr. Fechter can be found at the chart in *Bratton, supra,* p. 894.

**6.** Act 312 provides that upon certification that the parties are unable to agree upon all issues in a contract in the public sector, those issues upon which they cannot agree will be submitted to arbitration by an impartial arbitration board, which renders a binding decision. The obvious purpose of this legislation is to avoid strikes in the public sector. The most controversial portion of the Act 312 procedure is its imposition of a mandatory "last-best offer" decision upon the arbitrators. M.C.L.A. § 423.238. The arbitrators have no discretion in this regard and must accept one of the parties "last best offers." The parties present contract, which expired in 1983, is presently in Act 312 arbitration. The threat of this impending award colors the parties' position to this very day.

of this case. The City of Detroit contended that this award was excessive and was the direct cause of the layoffs. The number of officers laid off was also linked monetarily to the amount of the increased award. The testimony at trial also revealed that the City took a gamble with its court challenges to the award. . It did not set aside any monies in its budgets to pay for the award. Thus, when the Michigan Supreme Court affirmed the award, the City owed a very sizeable lump sum.

From the DPOA's point of view, its attitude during this period was understandably colored by the fact that as of June 1980, when the Michigan Supreme Court rendered its decision, it had still not received the monies due on a 1977 contract, based on a December 1978 award. By 1980, DPOA members were due a considerable sum of retroactive backpay and retroactive COLA.

## II

On February 22, 1984, this Court held that the City of Detroit violated the equal protection clause of the Fourteenth Amendment when it laid off the plaintiff class of black police officers. The court entered a partial summary judgment for plaintiffs, holding:

1. That, based on the findings of intentional discrimination in *Baker v. City of Detroit*, 483 F.Supp. 930 (E.D.Mich.1979), *aff'd sub nom Bratton v. City of Detroit*, 704 F.2d 878 (6th Cir.), *modified* at 712 F.2d 222 (6th Cir.1983), *cert. denied* — U.S. ——, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984), the City had a constitutionally imposed continuing affirmative obligation not only to stop the discrimination but to remedy all of the effects of the discrimination.

2. That the City had not yet remedied the effects of this prior discrimination when, in 1979 and 1980, it reduced black representation on the police force.

3. That by these layoffs, which the City knew full well would reduce black representation on the police force, the City breached its affirmative obligation to the plaintiffs in violation of their rights under the Fourteenth Amendment.

This ruling was predicated upon the findings of intentional past discrimination against blacks in the Detroit Police Department made by Judge Keith in *Baker, supra*. In *NAACP v. Detroit Police Officers Association*, 525 F.Supp. 1215 (E.D.Mich. 1981), this Court previously held in this case that the doctrine of collateral estoppel precluded relitigation of the issue of the City's past intentional discrimination, as found in *Baker*.

*Bratton* and *Baker* found that, at least until 1968, the City of Detroit "employed a consistent overt policy of intentional discrimination against blacks in all phases of its operations." *Bratton, supra*, at 888. Since the *Baker—Bratton* decisions were in the context of suits by white officers challenging the City's voluntary affirmative action plan, neither Judge Keith nor the Sixth Circuit had to reach the obvious corollary of these findings—that this consistent policy of intentional discrimination was in violation of the Fourteenth Amendment, which prohibits all invidious racial discrimination. *See Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). The record in *Baker* is "replete with evidence", *Bratton, supra*, at 888, of invidious racial discrimination against blacks in the Detroit Police Department prior to 1968.

In 1967, at a time when the City of Detroit was 40 percent black, the Detroit Police Department was only 6 percent black. Prior to that time, the Detroit Police Department had been a segregated department where blacks were assigned to patrol exclusively black areas, scout cars were segregated, and nearly every phase of the operation of the Police Department, from patrols to investigations to supervisory functions, was segregated. Perhaps even worse than the discrimination against blacks in the Detroit Police Department itself was the effect of this discrimination upon relations between the police and the black community. This relationship has been characterized by all observers as one

of deep hostility, and the race riots that occurred in this City in 1943 and 1967 have been directly tied to the hostility between the police and the community, a direct result of invidious racial discrimination in the Detroit Police Department.

Testimony introduced at trial in this case also confirmed the history of intentional race discrimination against blacks. Chief William Hart, who is black and who joined the Department in 1952 and eventually rose through the ranks to become Chief in 1976, testified about this past discrimination, as did Executive Deputy Chief James Bannon, who is white and who joined the Department in 1949.

Furthermore, Dr. Mark Bendick, Jr., the economist who updated the *Fechter* analysis from *Baker*, also testified that the statistical shortfalls of blacks in the Detroit Police Department over the years, up to the early '70s, could only be explained as the result of racial discrimination.

In *DPOA v. Young, supra,* a case in which white patrolmen and the DPOA challenged the City of Detroit's voluntary affirmative action plan mandating a 50/50 black-white ratio in promotions of patrolmen to sergeants, the court delineated the constitutional obligation here. "[T]he Constitution imposes on states a duty to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination." *Id.* at 691. In addition to the foregoing holding, the court held that "[I]t was error to require proof that the persons receiving the preferential treatment had been individually subjected to discrimination, for 'it is enough that each recipient is within a general class of persons likely to have been victims of discrimination.'" *Id.* at 694.

Based on these judicial findings of past discrimination, it is clear the City had an affirmative obligation to eliminate the continuing effects of past racial discrimination, and to eliminate all racial discrimination "root and branch." *Green v. County School Board,* 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1967). *See also Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Keyes v. School District No. 1,* 413 U.S. 189, 200 n. 11, 93 S.Ct. 2686, 2693 n. 11, 37 L.Ed.2d 548 (1973). The City had notice of all of these judicial findings as of October 1, 1979 when Judge Keith's opinion in *Baker* was issued.

Thus, in 1979, when the first of the massive layoffs of black officers involved in this case took place, the constitutional obligation of the City to eliminate continuing effects of past racial discrimination continued to exist. Although the City, through its voluntary affirmative action plan, had made great strides towards satisfying its constitutional remedial obligation prior to 1979, the obligation nonetheless remained in force in 1979. Although in 1978, the year before the layoffs involved in this case took place, 39 percent of Detroit police officers were black, the highest percentage ever, blacks still were 62.2 percent of the relevant labor market. The 1978 figure of 39 percent blacks still represented a 6.6 percent shortfall of what the percentage of blacks would have been absent racial discrimination, according to testimony of Dr. Bendick. Given the percentage of blacks in the Detroit labor market in 1978, this figure is a conservative one in terms of what percentage would have been constitutionally mandated. *See Bratton,* as modified on rehearing, 712 F.2d 222, 223 (6th Cir.1983).

It is clear that the layoffs in 1979 and 1980 had a devastating effect upon the City's affirmative action plan. The present percentage of black representation in the ranks of police officers is 28.3 percent, and in all ranks 27.9 percent. The relevant labor market in the City of Detroit today is well over 65 percent.

The City thus breached its affirmative constitutionally mandated duty to remedy past intentional racial discrimination in the Police Department when it began its massive layoffs of black officers in 1979 and 1980, and this breach was knowing and intentional. "If the actions of school authorities were to any degree motivated by segregative intent and the segregation re-

sulting from those actions continues to exist, the fact of remoteness in time certainly does not make these actions any less 'intentional.'" *Keyes, supra* 413 U.S. at p. 210–211, 93 S.Ct. at p. 2698–2699.

■ The September 3 letter of Mayor Young to David Watroba, plaintiff's Exhibit 1, shows that the City knew that it was under a legal mandate to continue its affirmative obligation to plaintiffs, and knew that the layoffs would have a drastic effect upon this obligation. Mayor Young wrote:

> In closing, let me remind you that affirmative action as a concept is not negotiable. It is mandated not only by the City Charter, but also by state and federal law and the Courts as well.
>
> It is also my opinion that the duty to implement affirmative action does not stop just because we have found more equitable ways to hire new police officers. Rather, we have a double duty— and we are now challenged to find equitable ways to implement the September 5 layoffs.
>
> The fact that we have found ways to remove hiring barriers at the front door does not relieve us of our obligation to find ways to remove comparable barriers at the back door, now that the circumstances require it.

■ The City argues that the law at the time was unclear on this subject, especially in relationship to the City's contractual obligation to the DPOA with reference to seniority rights. It is well established that good faith is not a defense by a municipality to a constitutional violation. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Further, the Fourteenth Amendment provides no mention of bona fide seniority clauses nor contractual obligations as a defense. Nor can state laws stand in the way of full and complete remedies for constitutional violations. *Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974). *See also Bakke,* 438 U.S. 265, at 307, 98 S.Ct. 2733 at 2757, 57 L.Ed.2d 750, (race-conscious action to remedy past discrimination is permissible, if based upon prior judicial, legislative or administrative findings of constitutional statutory violations.) (Powell, J.). Nor can parties by contract limit their liability for pre-existing constitutional violations.[7] This law was clearly established at the time the City began its unconstitutional course of action in laying off massive numbers of black police officers.

■ In its motion for reconsideration of this Court's order of partial summary judgment, the City objects to the finding of intentional discrimination at the time the City began its layoffs in 1979, and attempts to attach particular significance to general definitions of intent in the racial discrimination field, which hold that foreseeable results and discriminatory impact, *without more,* do not establish discriminatory purpose. *See e.g. Columbus Board of Education v. Penick,* 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1975), *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). This is not the situation here. Here we have the "more" —the judicial findings of past intentional discrimination made by Judge Keith in *Baker,* and affirmed by the Sixth Circuit in *Bratton.*

Given this past finding of intentional discrimination, the City becomes liable every time it knowingly and foreseeably breaches its affirmative obligations to remedy this discrimination. The remoteness in time

---

7. The City argues that in 1979 it was subject to conflicting legal obligations—its constitutional ones towards black officers and contractual obligations towards white officers. The City never sought declaratory relief from this or any other court. It cites no authority, nor could it, for the proposition that constitutional remedies can be frustrated by contractual obligations. Its citation of *W.R. Grace v. Local 759,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), for the proposition that it would have been subject to double liability to white officers had it taken steps to protect black officers is inapposite. *W.R. Grace* involved a conciliation agreement under Title VII, with no constitutional issues involved, nor previous judicial findings of past racial discrimination.

from the original act of intentional discrimination does not make later acts any less intentional. *Keyes, supra.* "Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Board of Education v. Penick, supra* 443 U.S. at 459, 99 S.Ct. at 2947. Thus, the City's discussion of the particular intent of the City in 1979–80 is largely irrelevant. "[T]he measure of the post *Brown* I conduct of the school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system." (Citations omitted). *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979).

This Court does not ascribe racially discriminatory animus to Mayor Young and his administration. It is obvious that he has led the attempts of the City to remedy past discrimination against blacks in the Police Department, attempts which have placed the City of Detroit in the forefront of major metropolitan areas in this regard.

However, it is equally obvious from the testimony and exhibits that in 1979, and more particularly in 1980, the City made a politically expedient decision that it would rather face a lawsuit by black police officers than face a lawsuit by white police officers.[8] It also decided it would threaten layoffs of black officers as a club against the DPOA in an attempt to roll back the 1978 Act 312 arbitration award, especially the retroactive pay and COLA increases ordered in that award.

It is not the function of this Court to inquire into the political wisdom of these decisions. However, the Constitution, and particularly the Fourteenth Amendment, exists precisely to insure that the individual and group rights of all citizens, especially minorities who have been historically shut out of the political process, are protected in the political process.

■ The rights of the black police officers and black citizens of Detroit to a fully integrated police force were sacrificed in the 1979 and 1980 layoffs. A city does not fulfill its obligations under the Fourteenth Amendment, nor does a union fulfill its obligations to fairly represent its members, by simply giving the difficult problem of redressing racial injustice in our society to the federal courts.

During the trial of this case, the United States Supreme Court issued its opinion in *Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). This case has initiated a far-reaching debate over its implications for affirmative action and civil rights in general, but this Court need not address this debate since *Stotts* is not controlling here.

*Stotts* involved Title VII.[9] This case involves liability under the Fourteenth Amendment. Title VII contains a clause specifically exempting bona fide seniority systems from attack.[10] The Fourteenth Amendment contains no such restrictions. *Stotts* and the Title VII cases relied upon by the Supreme Court there rest on interpretations of Congressional intent in enacting Title VII, and contain no interpretation of the Fourteenth Amendment.

In addition, *Stotts* involved a consent decree that specifically disclaimed liability for past discrimination. This case involves prior judicial determinations of past intentional discrimination.

The majority opinion in *Stotts* itself indicates it is distinguishable from a case where there has been a finding of past intentional discrimination: "Neither does it

---

**8.** This, the City concedes: "... they (the city defendants) clearly would have preferred to depart from seniority based layoffs, yet chose not to because they believed that a court would be more likely to award back pay to prevailing white plaintiffs than it would to prevailing black plaintiffs."

Brief of City of Detroit on City's motion for Partial Summary Judgment, page 2.

**9.** 42 U.S.C. § 2000e et seq.

**10.** Sec. 703(h) of Title VII, 42 U.S.C. § 2000e–2(h).

suffice to rely on the District Court's remedial authority under Sections 1981 and 1983. Under these sections, relief is authorized only when there is proof or admission of intentional discrimination.... Neither precondition was satisfied here." *Id.* —— U.S. at —— n. 16, 104 S.Ct. at 2590 n. 16.[11]

This view of *Stotts* is confirmed by the recent denial of certiorari in *Buffalo Teachers Federation v. Arthur,* cert. denied —— U.S. ——, 104 S.Ct. 3555, 82 L.Ed.2d 856 (1984). The Second Circuit's opinion below in *Arthur v. Nyquist,* 712 F.2d 816 (2d Cir.1983), involved the affirmance of a district court order that overrode the seniority system involving teachers in the Buffalo Public School System. This order was based on prior findings of intentional discrimination by the Buffalo school system, including the hiring of teachers.

The Second Circuit specifically held that the Title VII cases, which were the basis for the holding in *Stotts,* particularly *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), which protect bona fide seniority systems, are not applicable in cases seeking remedies for constitutional violations based on judicial findings of intentional racial discrimination:

> Nor was the District Court's authority impaired, as the Federation contends, by the Supreme Court's decisions in *American Tobacco Co. v. Patterson,* 456 U.S. 63 [102 S.Ct. 1534, 71 L.Ed.2d 748] (1982), and *International Brotherhood of Teamsters v. United States,* 431 U.S. 324 [97 S.Ct. 1843, 52 L.Ed.2d 396] (1977). In those Title VII cases, the Su-

preme Court ruled that bona fide seniority systems must be honored, unless there has been a finding of actual intent to discriminate ... Here, however, the suit was brought to remedy violations of the Constitution rather than Title VII, and the District Court made a finding of intentional discrimination in the Board's maintenance of a segregated school system. We therefore agree with the District Court that it had the authority to curtail the seniority rights of the Federation's membership in order to vindicate the constitutional rights of the minority children in the Buffalo school system.... Once a local board of education has been found to have employed staff hiring practices that contribute to a racially segregated school system, the District Court has the power to remedy those practices and to override seniority systems that perpetuate those practices.

*Id.* at 822.[12] *See also Oliver v. Kalamazoo Board of Education,* 706 F.2d 757 (6th Cir.1983), which reaffirmed this general principle, but held that the court-ordered remedy in the particular case was improper.

In general, no precedential effect should be given to a denial of certiorari. However, this Court can only conclude that, in light of footnote 16 in *Stotts, supra,* and the denial of certiorari in *Arthur* only two weeks after *Stotts, Stotts* presents no authority for changing this Court's determination of liability against the City of Detroit.

Therefore, this court reaffirms its determination that the City breached its affirma-

**11.** The Court does not accept the City's position advanced in post-trial argument that Title VII law regarding bona fide seniority systems is controlling in constitutional litigation. The cases cited by the City, *Chance v. Board of Education,* 534 F.2d 993 (2d Cir.1976); *Schaefer v. Tannian,* 538 F.2d 1234 (6th Cir.1976); *Stokes v. New York St. Dept. of Correctional Servs.* 569 F.Supp. 918 (S.D.N.Y.1982); and *General Building Contractors Assoc., Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) simply do not stand for this proposition, and until the U.S. Supreme Court declares otherwise, this Court will not write "bona fide senior-

ity system" into the U.S. Constitution, as the City invites it to do.

**12.** The City's attempt to distinguish this case, as well as a similar case, *Morgan v. O'Bryant,* 671 F.2d 23 (1st Cir.1982), cert. denied, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64, on the grounds they involved the vindication of the rights of students, not teachers, is not persuasive. Both cases involved findings of past intentional discrimination in hiring, as does this case. It is hard to fathom how the City can read these cases to stand for the proposition that it owes no constitutional duty to its black police officers. They stand for precisely the contrary.

tive obligations to the plaintiffs in violation of their Fourteenth Amendment rights.[13]

### III

"[T]he nature of the violation determines the scope of the remedy." *Milliken v. Bradley,* 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974), (Milliken I); *Hills v. Gautreaux,* 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544–45, 47 L.Ed.2d 792 (1974). Having established the liability of the City under the Fourteenth Amendment, it now becomes necessary to delineate the nature of the wrong, and the relief to be ordered against the City.

For the class of laid-off black officers there is obviously the loss of their jobs, which resulted from these unconstitutional acts, as well as the loss of back pay and other fringe benefits. William Bracey, former Chief of Patrol of the New York City Police Department, a very informative and credible witness, who, in 36 years, rose from the ranks of patrolman to become the highest ranking black officer in the New York Police Department, testified dramatically to this point.

He described the traumatic effect of layoffs on newly-hired black officers, stressing that when black officers are laid off after only serving briefly they have an added burden that white officers do not have. Because of the past racial animosity to the police, they often are alienated from friends and families, and are likely to have less support from them when they are laid off after just recently being hired. Often all of the distrust engendered by years of segregation surfaces again, and the officer, his friends and family think, "They're playing games with you. They really didn't want you in the first place."

Chief Bracey testified that this trauma is even more acute for rookie officers, and that the normal adjustment to becoming a police officer is difficult enough without the newly-hired black officers having the additional trauma of getting a message from the City that it is not serious about remedying the past discrimination in the Department.

■ Thus, based on this testimony, the Court finds that in addition to the usual losses sustained with the loss of employment, the class of black officers suffered injury as a direct result of the City's past racial discrimination, and its failure in 1979 and 1980 to continue to remedy this discrimination. To put it bluntly—they suffered the trauma of betrayal. After placing their standing in the community in jeopardy by joining the police force, they had to now face the inference that the City was "playing games" with them, and was not serious about its efforts to remedy this past discrimination. This trauma was directly tied to the City's constitutional violation.

■ Without minimizing the losses suffered by the black officers, testimony at trial revealed a constitutional violation of even greater magnitude—the harm to the black citizens of the City of Detroit. Perhaps even more than the individual officers, they are the victims in this case.

When we deal with the police in an employment situation, we are not dealing with a private employer. The police function "fulfills a most fundamental obligation of government to its constituency." *Foley v. Connelie,* 435 U.S. 291, 297, 98 S.Ct. 1067, 1071, 55 L.Ed.2d 287 (1978). *Baker, Bratton,* and *DPOA v. Young* have affirmatively recognized what is known as the "operational needs" defense for affirmative action in the Detroit Police Department—that the presence of black officers on the police force is vital in enabling the police to effectively fulfill its police function. *See also*

---

**13.** In addition to its Fourteenth Amendment claim, plaintiffs assert claims under the Thirteenth Amendment, 42 U.S.C. §§ 1981 and 1985(3). Given this Court's holding regarding the Fourteenth Amendment liability of the City, it is unnecessary to reach the Thirteenth Amendment and § 1981 claims. There has been no showing sufficient to sustain a finding of conspiracy liability under 42 U.S.C. § 1985(3). The evidence shows that the City and the DPOA have agreed upon virtually nothing since 1966.

*Van Aken v. Young,* 541 F.Supp. 448 (E.D. Mich.1982).

In *DPOA v. Young, supra,* the Court held:

> The argument that police need more minority officers is not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather, it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police. In short, the focus is not on the superior performance of minority officers, but on the public's perception on law enforcement officials and institutions.

608 F.2d at 696.

*Baker* and *DPOA v. Young* developed the operational needs theory in terms of legal justification for affirmative action. The testimony in this trial persuasively developed the converse—the harm to the black citizens in Detroit when the City retreated from its commitment to affirmative action and a police force that met the needs of its community.

The testimony of Chief Bracey, Patrick Murphy, former Detroit and New York City Police Commissioner and currently president of the Police Foundation, Chief Hart, Deputy Chief Bannon, and Mayor Young developed the operational needs concept. Former Commissioner Murphy testified that the presence of black officers is vital to the whole concept of democratic policing, and that police should come from the people they serve. He emphasized the way black officers can educate white officers on the mores, folkways and language of the black community. He stated that it is absolutely necessary that the community be involved in policing, and to accomplish that, police officers must be representative of the community. He testified that there has been great improvement in police-community relations over the last 15 years, and that this has been largely due to the existence of more minorities on police forces. This evidence is overwhelming, and largely unrebutted. No one today could seriously hold the DPOA's position that a white police force living in the suburbs could effectively police the City of Detroit.

Mayor Coleman Young pointed out that formerly there was great alienation between the black community and the police department which resulted in ineffective law enforcement and poor community relations. This was changed in recent years. The Mayor also pointed out that the DPOA has exerted great influence in past administrations, and has regularly resisted efforts to hire more blacks. He testified that no officer of the DPOA had ever protested racial discrimination in the Detroit Police Department, or complained to him on behalf of any of its black members.

Chief Hart and Deputy Chief Bannon also testified forcefully on this subject. They said that, prior to 1974 when the City first seriously began to eliminate racial segregation in the Detroit Police Department, the Department was viewed as an occupation army by the black citizens of Detroit. This, they said, reduced the effectiveness of the police in that they could not get witnesses to testify or cooperate in solving crimes, controlling crowds, or in crime prevention.

Both testified concerning changes that have taken place since citizens began to see that the City was serious about making the police more representative of the citizenry. There is a greater degree of police-citizen cooperation, crowd control is more easily handled, and crime prevention projects have increased dramatically. Furthermore, police fatalities have been drastically reduced. All of this is tied to the presence of sufficient numbers of blacks on the Detroit Police Department.

Chief William Hart has been chief since 1976. He has a doctorate from Wayne State University, and is a career police officer, having entered the Detroit Police Force in 1952.

Chief Hart outlined the history and background of the relationship between the police and the community in the 1950s and the 1960s, pointing out that at that time

relations were very bad, and that the police, predominately white, was considered an army of occupation. He testified that when he first went on the force only three precincts had black officers, and that the department was totally segregated. Poignantly, he testified that he could not be assigned to a clean-up squad (a local vice squad in the precinct) until he could find a sergeant who would have a black on his team.

Chief Hart testified that the lack of trust in the police department prior to the '70s made it very difficult to properly police the City. He testified that after 1974 police-community relations changed dramatically, and he says now the people in the neighborhoods are part of the solution rather than part of the problem. Violence has been greatly reduced against police officers because of integration, and the rate of police killings has been greatly reduced. Police brutality against citizens has been greatly reduced and is almost nil at the present time.

Finally, Chief Hart pointed out that, with the layoff of the large numbers of black officers, the forward strides have been put on hold. The layoff of blacks has hampered the ability to fight narcotics, to do undercover work, to do surveillance work, and to work with organized crime and vice. Although there is a residue of good will in the community resulting from the increased black representation on the force, such good will cannot last forever. He wants all of the officers, black and white, called back.

Executive Deputy Chief James Bannon, of the Detroit Police Department, is a white, career police officer, who has been on the force since 1949. He holds a Ph.D. degree. He also testified that there is presently mutual support between the community and the Police Department, and reiterated Chief Hart's testimony that formerly the Police Department was an occupation force in the black community. The changes in attitude that have come about as the result of the number of blacks coming onto the force has been dramatic. Several factors brought about this change in the community and in the force, according to Chief Bannon:

1. A black Mayor and a black Police Chief have given people a feeling of accessability;

2. Blacks are in policy positions in the Department for the first time;

3. The high visibility of black officers in the community has been significant in changing the community's attitudes.

The testimony of all police officials was that, as the result of the increase in black representation on the police force, the community relations with the police force had dramatically improved since 1974, and there has been a complete reversal in community attitude towards the force. They all testified, however, that the good will developed by the Detroit Police Department since 1974 is not inexhaustable, and can be used up if the community begins to see the return to the past days of racial segregation in the Detroit Police Department. Although the presence of many black command officers, who were unaffected by the layoffs, somewhat ameliorates this problem, it is undisputed that black patrol officers are the most visible, have the most daily contacts with the community, and are most important in crime prevention and community relations. Therefore, massive reductions in the numbers of black police officers below the rank of sergeant on the street will have dramatic effects.

Just as significant as the testimony were the exhibits showing the effect of these layoffs on the actual operations of the Detroit Police Department. A particularly significant exhibit was Exhibit 645, which shows the racial composition of the Detroit Police Department by sections and precincts. The Special Events Unit, a highly visible unit charged with crowd control during major events, has been reduced from 28 percent black prior to the 1979 layoffs to presently six percent black. Precinct No. 5, which in September 1977 had a population that was 63.1 percent black, today has 18 percent blacks on patrol. Precinct No.

15, a predominently white precinct, which, prior to the layoffs, had 33 percent blacks on patrol, today has four percent blacks. Only six black officers, divided among three shifts, are now assigned to this precinct. This statistic parallels the worst days of segregation in the police department.

Finally, Exhibit 645 shows that the Youth Bureau, in a city where 80 percent of the youth is black, is only 13 percent black. Given the importance of black officers as role models for the youth and the importance of preventing youth crime, this statistic is a striking demonstration of the effect of this constitutional violation.

Thus, the City is in real danger of seeing the gains of the 1970's in terms of police-community cooperation reversed, if the City's unconstitutional layoffs are not remedied.

It is clear from the testimony of Mayor Young and the police experts, Bracey, Hart, Bannon, Murphy, and the exhibits, that the return of black officers to the streets of the City of Detroit is not only necessary to vindicate the constitutional rights of the black police officers, but is also an absolute necessity to restore balance to the community, and the confidence of the community in the Detroit Police Department. Their testimony was intelligent, credible and convincing, and clearly established the need for the return to the force of the black police officers.

Thus, there are two constitutional violations which must be remedied—the harm resulting from the City's abandonment of its black officers, and the harm to the black community if the police force is returned to the days of racial segregation.

It is well established by now that race-conscious remedies are permitted to redress constitutional violations. *Bakke, supra,* 438 U.S. at 307, 98 S.Ct. at 2757; *Bratton, supra,* at 882; *DPOA v. Young, supra,* and *Oliver v. Kalamazoo, supra.* Class-wide relief to remedy past constitutional violations is equally permissible without the individual members of the class having to prove that they were actual victims of past discrimination. "[I]t was error to require proof that the persons receiving the preferential treatment had been individually subjected to discrimination, for 'it is enough that each recipient is within a general class of persons likely to have been victims of discrimination.'" *DPOA v. Young, supra,* at 694, citing *Bakke.*[14]

Although race-conscious remedial relief is permissible, the remedy must be "necessary" and "tailored" to cure the constitutional violations. *Oliver, supra,* at 764. A similar standard was established by Justice Powell in *Bakke:* "When they [classifications] touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Bakke, supra,* 438 U.S. at 299, 98 S.Ct. at 2753. And it is clear that this Court is mandated to "balance individual and collective interests." *Swann v. Charlotte-Mecklenburg, supra* 402 U.S. at 16, 91 S.Ct. at 1276.

Based upon the findings of liability and the findings of the nature of the constitutional violation, this Court will order the following relief to cure the constitutional violation:

The first relief to be ordered is the reinstatement of all black officers laid off in 1979 and 1980 who currently remain on layoff status, and who wish to return.[15]

---

**14.** For the reasons set forth, *supra,* pp. 1202–1204, *Stotts* does not affect this holding of the Sixth Circuit.

**15.** As discussed earlier, this Court rejects the City's argument that the distinctions made in *Arthur v. Nyquist, supra,* and *Morgan v. O'Bryant, supra,* between harm to the public and harm to individual employees, prevent this

Court from ordering the recall of the plaintiff officers. The constitutional mandate of this Court is that the remedy must be related to the "*condition* alleged to offend the Constitution...." *Milliken v. Bradley,* 433 U.S. 267 at 280, 97 S.Ct. 2749 at 2757, 53 L.Ed.2d 745. This is what the recall of these officers is designed to do. The City argues against the recall of the

This should be done in an orderly manner and over a period of time, so that the City will have an opportunity to make the budget adjustments necessary to effectuate the return of these officers.

Therefore, the Court will order that all these officers be called back within 180 days of this opinion. Seniority will control in determining the order of callback. Within 30 days of the date of this opinion, the City shall present to the Court a plan to accomplish this.

All callbacks will be subject to the normal procedures of the Police Department—that is, the Department must determine if each officer desiring to return to duty is still qualified to be a Detroit police officer. If he or she is not, but can become qualified through additional training, such training shall be provided. In short, the Department may subject officers desiring to return to duty to the normal procedures employed by them for all returning laid-off police officers.

Moreover, all officers returned under this order shall be awarded the seniority he or she would have had, if there had been no layoffs.

In addition, the Court permanently enjoins the City from laying off, suspending, or discharging, except for disciplinary reasons, any black police officer without the prior approval of this Court. This remedy is necessary to vindicate the needs of the individual black officers and the compelling state interest in a police force reflective of this community.

Similarly, the Court permanently enjoins the City from laying off, suspending or discharging, except for disciplinary reasons, any white police officer, without the prior approval of this Court. It is possible that one of the solutions the City will seek to the remedy in this case will be to attempt to layoff white officers with higher seniority than blacks. This the Court, at the present time, will not allow. The case law—*Bakke, Oliver, Arthur*—demands that the Court take into consideration the interests of white officers with higher seniority than blacks.

The financial information furnished to the Court, which perhaps could be relevant to this issue, was less than satisfactory. Although it was represented that the Budget Director of the City of Detroit would be produced as a witness, the City failed to produce him, and in his stead produced a budget analyst, Edward Rego, whose testimony was vague and imprecise upon budget figures.

Mr. Rego, while admitting that the budget of the City is merely a financial manifestation of a series of political choices, was unable to explain items amounting to some $300,000,000, nearly 20 percent of the 1.5 billion budget for 1984–1985. He made much of the claim that certain budget items are restricted by state or federal law, but the record, insofar as it was made, established that only 39 percent of City employees are on jobs which are funded from either revenue sharing or other grant monies from the federal or state governments.

While the Police Department budget was less than 26 percent of the City's non-restricted budget, the Police Department's share of budget reduction effort in 1979, 1980, and 1983 was more than 50 percent of the total. This is so even though the cost of a police officer (salary plus fringes) proved to be only $44,560, rather than the $50,000 per year earlier used by the City.

Next, the Court must concern itself with the rights of laid-off white officers who may be senior to black officers being called back under this order. Their interests must be taken into account in fashioning any final remedy. This is mandated by *Bakke, DPOA v. Young, Oliver v. Kalamazoo,* and *Arthur v. Nyquist.* But in every one of those cases, the white officers

officers, and yet asks this Court to order affirmative action recalls and layoffs at the will of the City, intervention in the City-DPOA Act 312 proceedings, and a wage freeze (City Trial Brief, p.

49). This argument is self-serving and based on *Byzantine* legal distinctions which this Court rejects.

or teachers were actively present in the lawsuit and presented their interests. This did not happen here. Although the DPOA protested that it did represent the white officers, this Court has found that they did not, and that the white officers had no adequate representation in this case.[16] There is no showing on this record of the numbers or the interest of these officers, and the Court has nothing other than speculation upon which to make a determination of their interests.

This Court will therefore allow 30 days for any laid-off white officer, with greater seniority than any laid-off black officer called back, to intervene in this lawsuit for a determination of his or her interest. The Court expresses no opinion as to these interests, if any, nor does the Court express any opinion as to whether doctrines of estoppel, latches, etc. would bar the Court from considering their claims. The Court simply believes that, given the record introduced by the DPOA in this case, and contrary to their representations that they represented the laid-off white officers, equity requires that any white officer who desires be heard. It will be the responsibility of the City of Detroit to notify all laid-off white officers of this determination.

The next request for relief is the ordering of back pay. This Court will not order back pay relief against either the City or the DPOA. Even in Title VII cases, where back pay is generally presumed, the Court still retains equitable discretion and can deny it for equitable reasons. *See City of Los Angeles Department of Water and Power v. Manhart*, 435 U.S. 702, 722–23, 98 S.Ct. 1370, 1382–83, 55 L.Ed.2d 657 (1978). But this is not a Title VII case. Here the Court has even greater equitable discretion under a constitutional analysis, especially in light of judicial mandates that constitutional remedies be tailored to the scope of the constitutional violation. *Mil-liken, supra, Oliver v. Kalamazoo, supra.* The Court must necessarily balance the individual and collective interests involved.

Although this Court has already held that class-wide remedial relief is not limited to individual victims of prior discrimination, and has ordered such remedial relief, and although this Court does not believe that any legal authority bars back pay in a situation such as is presented here, the Court must take into account the fact that no evidence has been presented that any individual member of the plaintiff class was an actual victim of racial discrimination in hiring. This is an equitable factor that must be weighed in balancing individual and collective interests and tailoring the scope of the remedy.

The wrong in this case was not only that of individual discrimination. It was also a collective wrong, a wrong to the expectations of the citizenry and the black police of the City of Detroit, who expected the City to be serious about its commitment to affirmative action, which would result in a police force reflective of the community. The collective interests outweigh the admittedly important private interest in back pay in this case, and merit denial of back pay.

Regardless of the amount of any back pay award,[17] it would certainly be substantial. These costs would be borne primarily by the black citizenry of Detroit. While financial inability to pay is no defense to a constitutional remedy, financial factors certainly must enter into the equitable balancing this Court must undertake. The relief the Court has ordered will sufficiently make the plaintiffs whole, and is tailored to the constitutional violation. In view of the fact that the violation here was to the collective interests of the laid-off officers and the citizens of Detroit, this Court believes justice will not be served by a mas-

---

16. See colloquy between the Court and counsel, Transcript of Testimony, Volume 14, June 13, 1984, pp. 1649–53.

17. If back pay were ordered, Chief Hart said it would ruin the City. Dr. Sidney Mitre, Professor of Economics at Oakland University, testi-

fied that the total wage loss suffered by all officers as a result of the layoffs was $50,734,700, the total pension loss was $32,321,667, and the fringe benefit loss $5,386,940, for a total of more than $86,000,000.

sive back pay award, and therefore back pay will be denied.

### IV

The DPOA, which was established in 1943, was formally certified to serve as the collective bargaining agent for all Detroit police officers below the rank of sergeant in 1966. It was granted its authority by the Public Employee Relations Act of 1965, M.C.L.A. § 423.211, which provides in pertinent part:

> Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining with respect to rates of pay, wages, hours of employment or other conditions of employment...

■ As the exclusive bargaining representative for its members, the DPOA has a duty of fair representation under Michigan law. *Lowe v. Hotel & Restaurant Employees Union, Local 705*, 389 Mich. 123, 205 N.W.2d 167 (1973). Plaintiffs claim that the DPOA breached this duty, which is a pendent one brought under Michigan law. According to Michigan law, the Court must look to federal law for guidance in deciding the fair representation issue, since the full development of this doctrine has taken place through judicial interpretation of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq. *See Bebensee v. Ross Pierce*, 400 Mich. 233, 253 N.W.2d 633 (1977).

■ The duty of fair representation is a judicially created remedy. There is no specific reference to it in either the NLRA or in Michigan statutory law. Instead, the doctrine has been developed by the judiciary as a necessary, and, in the case of racial discrimination, a constitutionally imposed duty arising from the grant of authority by legislatures to unions to be the exclusive representatives of their members. By allowing unions to be exclusive representatives of their members, and thus sub-

suming rights of minorities in collective bargaining, unions have not been granted licenses to practice racial discrimination in violation of either the Fourteenth Amendment or the equal protection clause of the Michigan Constitution. Mich. Const. Art. 1, § 2.

Since this case involves claims of racial discrimination by an exclusive bargaining representative (the DPOA), the Court must be especially sensitive to the fact that the duty of fair representation arose as a doctrine to protect minorities, and blacks in particular, from racial discrimination by unions. When the NLRB was originally established, leaders of black organizations expressed fears that by granting exclusive representative status to certain unions, racially discriminatory policies by unions would have the authority of a law.

Congress attempted to allay these fears in the debate surrounding the NLRA, and the United States Supreme Court firmly outlawed racial discrimination by unions by establishing the duty of fair representation in *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). The Court held there that the duty of fair representation required the union to represent minority union members without hostile discrimination, fairly, impartially, and in good faith:

> So long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of the craft. While the statute does not deny to such a bargaining labor organization the right to determine eligibility to its membership, it does require the union, ... to represent non-union and minority union members of the craft without hostile discrimination, fairly, impartially, and in good faith....

*Id.* at 204, 65 S.Ct. at 232.

■ It is clear that the exclusivity principle of the NLRA and M.C.L.A. § 423.211 is constitutional only if there is a duty of

fair representation, and that means representation of all members of the union. The duty of fair representation is a fundamental limitation upon union activity. *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).

Without the judicially imposed duty of fair representation, the tradeoffs made by minorities in allowing unions to be their exclusive representatives in order to protect majority interest and to achieve industrial peace through the encouragement of voluntary agreements, the purposes of the NLRA would be hollow. In return for exclusive bargaining, blacks in the DPOA are prohibited from bargaining directly with the City of Detroit, and are prohibited from taking any direct action against the City of Detroit independently of the DPOA. *See Emporium Capwell Company v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975). The DPOA is the only spokesperson for black police officers to the employer, and thus has tremendous power over the welfare of black employees. The judiciary has a duty to see that this power is not abused, and does not become a grant of authority to practice racial discrimination.

Michigan has recognized the duty of fair representation as a matter of state law:

> In many ways, the relationship between a union and its members is a fiduciary one. Certainly it is a relationship of fidelity, of faith, of trust, and of confidence.

*Lowe*, 389 Mich. at 145, 205 N.W.2d 167. And,

> [T]he union must act without fraud, bad faith, hostility, discrimination, arbitrariness, caprice, gross nonfeasance, collusion, bias, prejudice, wilfull, wanton, wrongful and malicious refusal, personal spite, ill will, bad feelings, improper motives, misconduct, overreaching, unreasonable action, or gross abuse of its discretion....

*Id.* at 146–47, 205 N.W.2d 167.

There is no reason to believe that Michigan would interpret this duty more narrowly than the U.S. Supreme Court. The state has a historical commitment to the abolition of racial discrimination, and has been a leader in breaking down the barriers between races. In fact, to the extent that Michigan case law has evinced a standard different from the federal standard, it appears to be even more strict than the federal standard. "When the general good conflicts with the legal or civil rights of an individual member, the courts will recognize and enforce them as against the will of the majority union membership." *Lowe*, 389 Mich. at 146, 205 N.W.2d 167.

As a judicial remedy, the legal standard for finding a breach of the duty of fair representation must be somewhat open ended and flexible, given different factual circumstances. As Judge McCree pointed out in *St. Clair v. Local No. 15 of International Brotherhood of Teamsters*, 422 F.2d 128, 130 (6th Cir.1969): "The phrase 'fair representation' is something of a term of art, and the standards by which we are bound have not been set down explicitly in a code."

Thus, "fairness" is the standard for the duty of fair representation. The duty requires rational decision-making and procedural protection to protect minority members from discriminatory treatment. It has been said that the duty of fair representation creates a duty of "fair dealing." *International Union of Electrical Workers v. NLRB*, 307 F.2d 679, 683 (D.C.Cir.1961), *cert. denied* 371 U.S. 936, 83 S.Ct. 307, 9 L.Ed.2d 270 (1962).

The duty of fair representation was defined by the United States Supreme Court in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967):

> Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct ...

*Id.* at 177, 87 S.Ct. at 910.

The test was similarly stated in *Farmer v. ARA Services, Inc.*, 660 F.2d 1096 (6th Cir.1981):

A union fails to fairly and impartially represent all members of a bargaining unit, and thus breaches its duty of fair representation, when the union's conduct toward any member becomes arbitrary, discriminatory or in bad faith. . . .

Bad faith or fraud is not a necessary element of a charge of unfair representation if the union's conduct is otherwise arbitrary or perfunctory (citing cases). Arbitrary perfunctory union conduct which exhibits something more than simple negligence is a breach of the duty of fair representation.

*Id.* at 1103.

The *Farmer* court also pointed out that a union is required to represent its members fairly and impartially, and to make an honest effort to serve the interests of all without hostility to any. To fulfill its duty, the court said: "the union must have not only enforced the provisions of the collective bargaining agreement in a non discriminatory manner, it must have also fairly represented all segments of the bargaining unit during the negotiations of each collective bargaining agreement." *Id.* at 1103.

Any one of three elements—arbitrariness, discrimination, or lack of good faith—can create a breach of the duty of fair representation. The standard was well summarized in *Griffin v. U.A.W.*, 469 F.2d 181 (4th Cir.1972):

First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting its rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. *Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.*

*Id.* at 183. (emphasis added).

In *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Supreme Court recognized that active or tacit consent to discriminatory enforcement of a facially neutral conduct could constitute a breach of the duty of fair representation. *Id.* at 46, 78 S.Ct. at 102. And the Second Circuit has found a duty of fair representation violation in a union's failure "[T]o provide substantive and procedural safeguards for minority members of the collective bargaining unit." *Jones v. TWA*, 495 F.2d 790, 798 (2d Cir.1974).

This circuit has recognized that the duty of fair representation is an active and affirmative obligation on the part of union leadership. The duty "requires a union to assert the rights of its minority members in collective bargaining sessions and not passively accept practices which discriminate against them." *E.E.O.C. v. Detroit Edison Company*, 515 F.2d 301, 314 (6th Cir.1975), *vacated*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977), citing *Macklin v. Spector Freight Systems*, 478 F.2d 979 (D.C.Cir.1973). *See also Bonilla v. Oakland Scavenger Company*, 697 F.2d 1297, 1304 (9th Cir.1982): "The union has an affirmative obligation to oppose employment discrimination against its members."

The union's obligation under the duty of fair representation is analogous to that of a fiduciary to a principal. Clearly the union has a higher standard to its members than the standard owed by the employer to the employee. This is confirmed by language in *Steele:* "It is a principle of general application that the exercise of a granted power to act on behalf of others involves the assumption towards them of a duty to exercise the power in their interest and behalf, and that such a grant of power will not be deemed to dispense with all duty towards those for whom it is exercised unless so expressed." 323 U.S. at 202, 65 S.Ct. at 232.

Under the standard first established in *Steele,* elaborated in *Vaca v. Sipes,* and recognized by the Michigan Supreme Court in *Lowe,* and in keeping with the firm policy of the State of Michigan against racial discrimination, this Court finds the DPOA guilty of a breach of its duty of fair representation through its failure to adequately

represent the interests of its black members in the layoffs of 1979 and 1980.

Initially, it must be stated what this liability is *not* predicated upon. It is not predicated upon any adherence by the DPOA to a seniority-based system of layoffs. This Court finds the seniority system negotiated between the DPOA and the City to be bona fide. Nor is this liability predicated upon any duty of the DPOA to make concessions or give up demands won at the bargaining table and in the courts. The Court agrees with the DPOA that no such *per se* duty to minority members of a bargaining unit exists, and this finding of liability does not imply such a duty.

The DPOA's breach of the duty of fair representation flows not merely from any reliance upon a seniority system, or a simple refusal to make concessions in the interest of minorities. The D.P.O.A.'s liability is premised on more than this, and flows inescapably from the following findings:

1. *A history of racial hostility and indifference to the rights and needs of black officers.*

The history of black relationships with the DPOA is one showing at the best indifference, and at the worst hostility, to the blacks by the white members of the DPOA throughout the years.

Witness after witness, all black and all police officers or sergeants, testified to the discriminatory manner in which they were treated by the DPOA. Of particular significance was the testimony of Fernon Douglas, a black police officer who came on the force in 1972 and is still a member of the Detroit Police Department. In 1978, he was elected a shift steward and also a chief steward of the DPOA. In 1978, he was nominated for sergeant-at-arms, one of the four officers of the union, but did not run after John Vella, a white member of the executive board, told him that, if he ran for sergeant-at-arms, all blacks would be removed from committee assignments. Vella denied making such a statement, but the Court finds as a matter of fact that he did.

Douglas was nominated again for sergeant-at-arms in September 1982, but, after a meeting of black stewards, he decided not to run. Additionally, he was active in proposing constitutional changes, one of which would have required that no DPOA funds be spent for litigation, except for litigation relating directly to the contract between the City and the DPOA. This amendment, and other constitutional amendments proposed by him and other black officers, were soundly defeated.

It is true that the DPOA has always represented black officers in disciplinary proceedings and court proceedings the same as they represented white officers, but this does not change the fact that in 1979 and 1980 the union did not adequately represent its black members in bargaining to prevent their layoffs.

Throughout, the DPOA has maintained opposition to all forms of affirmative action by the City and the Police Department. In addition to demanding strict seniority in its contract, it has intervened repeatedly in litigation designed either to block implementation of affirmative action, or supported those trying to block affirmative action. Testimony was introduced indicating that the DPOA has spent over $500,000 financing its anti-affirmative action litigation. And this intervention has not been limited to the City of Detroit. For example, it has filed amicus briefs supporting challenges to affirmative action in Boston, New Orleans, and Memphis. In none of these cases was the DPOA directly involved, and efforts of black members to amend the constitution to prohibit the use of union funds for such amicus briefs were soundly defeated by the organization.

It should be obvious to any neutral observer that blacks, who at one point comprised almost 40 percent of the DPOA, would be greatly offended by the use of such vast sums of money to fight what blacks believed to be efforts to achieve racial equality for them.

To partially deal with the problems of black officers, the Guardians, an organiza-

tion of black police officers of all ranks, and from departments other than Detroit, was formed in the early 1960's. In addition, the Committee of Police Officers for Equal Justice (CPOEJ) was formed to deal with the problems of black officers. The DPOA avoided dealings with either the Guardians or the CPOEJ, and is hostile to these organizations. In some contexts, the DPOA's explanation that these organizations had supervisors and non-Detroit members and, therefore, created dual union concerns, would be legitimate. The Court finds, however, that in the context of past racial discrimination against blacks in the Detroit Police Department, and the past racial hostility of the DPOA, these explanations are largely pretextual.

Further support for this conclusion is found in the fact that, according to the testimony of the DPOA officials at trial, not a single black officer in their union is worthy of trust. Any member of the Guardians is automatically "disloyal." Non-members of the Guardians, like Fernon Douglas, who still expresses black concerns yet is a militant unionist, are "not interested in the union as a whole." These explanations are pretextual, especially given the broad-based support of the Guardians, and the support from both black and white officers enjoyed by Fernon Douglas. In 1978, Lewis Colson, a black officer, ran for vice-president on the Guardian slate and received 1,100 votes. The same year, Deborah Robinson, a presidential candidate, received 1,200 votes. Blacks in 1978 made their largest gains ever in terms of union positions in the DPOA, and the Court cannot believe that this political consideration did not play a role in the DPOA leadership's passivity in face of the 1979 and 1980 layoffs.

2. *The total absence of black representation in the leadership levels of the union.*

Throughout its entire history, the DPOA has been a white-dominated union. It has a board of directors, made up of 75 stewards, who are elected in each precinct and division, and from each shift. The board of directors elects from its members nine persons to serve on the executive committee, and the membership at large elects four officers: the president, vice-president, secretary-treasurer, and sergeant-at-arms. All committee appointments are made by the president, with the approval of the executive committee.

No black has ever been elected to any one of the top four positions in the DPOA in its 41-year history. There have only been two black members who have served on the executive board, and the board of directors has only 18 nonwhite members.

The most significant committee of the DPOA is the grievance committee, which consists of three members, who, along with the four elected officers, constitute the bargaining committee. No black has ever served on the grievance committee. Nor has any black ever served on the finance committee, another major committee of the DPOA. As stated earlier, this Court rejects explanations that there were not sufficient "trustworthy" blacks to fill these positions or that "political patronage" should be the only criterion for union leadership when this patronage operates to exclude blacks.

3. *The massive nature of the 1979 layoffs—one-quarter of the DPOA membership, one-half of the black membership, a loss of approximately $500,000 a year in dues, and the totally perfunctory and passive behavior of the union leadership.*

As early as the Spring of 1977, the City began efforts to obtain DPOA agreement to a proposal that future layoffs be carried out in a manner that would avoid having a racially discriminatory impact on blacks and women. These proposals were strongly and consistently resisted by the DPOA. Affirmative action layoff procedures were proposed again in 1978, and throughout discussions and negotiations the Union would at no time back off its position on seniority and its refusal to consider any type of affirmative action layoffs.

Finally, the first layoffs came in October 1979. Mark Ulicny, the City's Labor Relations Director, advised Mr. Watroba, by

letter on September 27, 1979, that 400 police officers would be laid off as of October 12, 1979. Although the position of the DPOA had been that the City was merely posturing, as of September 27, 1979, it knew that it was no longer posturing. Nonetheless, the DPOA did nothing to avert the 1979 layoffs. 71 percent of those laid off at that time were black officers. No effort was made to use the same formula successfully used on 1975, when a majority of those to be laid off were white, and no other effort was made, as it was in 1981, when the vast majority of those to be laid off were white.

In February 1980, the City again proposed, as to layoffs, that seniority should be used only to the extent that it does not reduce the proportions of minority group members or females within the bargaining unit. This proposal was flatly rejected by the DPOA.

The record is clear that the DPOA was well aware, as early as the Spring of 1980, that upwards of 700 police officers were to be laid off in the fall, and that the overwhelming majority of those to be laid off would be black. Even though officers of the DPOA testified that they thought the City was merely posturing, it is clear that they knew that more layoffs were coming, and it was clear the DPOA was not going to take significant action to avoid them. In the August 18, 1980 issue of *Tuebor*, the union newsletter, there is specific mention of the anticipated layoff of more than 700 DPOA members within a matter of days.

On August 29, less than two weeks after the *Tuebor* issue which described in great detail the potential layoffs, Mayor Young sent a letter to Watroba inviting him to a meeting to discuss ways of averting the scheduled layoffs. In that letter, the Mayor spoke of the impending layoffs of 690 Police Officers, and emphasized the disastrous effect it would have upon the City's past affirmative action:

But there is an additional reason why these layoffs will hurt us all. During the past seven years, we have been working to create a police department integrated by race and sex through an affirmative action program. This program was an essential pre-condition to establishing harmonous police-community relations, without which our police can never effectively carry out its duties.

Because these layoffs are being made according to strict seniority, in accordance with the present contract, and not in pursuance of our affirmative action program, they will drastically reverse our progress towards the goal of a fully integrated police force, and we will be moving towards a department again composed predominately of white and male officers.

The Mayor then made specific proposals to the Union:

Recent negotiations for a new contract have proved fruitless and the issues are about to be submitted to final arbitration, as required by existing law. This is one such issue. However, it will be many months before a decision is made.

As a temporary measure, without prejudice to our respective positions before the arbitrator, I suggest the following alternative procedures for the impending layoffs:

1. Instead of seniority being the sole critereon for layoffs, thus resulting in grossly disproportionate layoff of blacks and women, we agree that layoffs be made on the basis of separate lists, such as the plan for proportions which was approved by the Sixth Circuit Court of Appeals recently, as an appropriate means of implementing our affirmative action program.

Or, if you prefer:

2. Instead of any layoffs, a 13.8 reduction in the Police Department payroll be agreed upon, with by equal reduction by all officers of workdays or some other equitable method.

Governor Milliken's recent proposal for applying an affirmative action program to the layoff of State employees has just been approved by the Michigan Civil Service Commission and serves as an example of what we can do for Detroit by

mutual agreement. I realize the shortness of time. But our commitment to the welfare of our community compels all of us to do what we must to avoid moving backward towards racial hostility and divisiveness.

When asked what the union response to the Mayor's proposal was, Watroba replied that seniority was the cornerstone of unionism, and that the DPOA would not, under any circumstances, negotiate separate layoff lists in which race was a factor in determining who was to be laid off. He said that, if they were going to deal with the Mayor, they would have to deal on the basis of his second proposal, a 13.8 percent wage reduction, and not his proposal for separate layoff lists. He said, however, that, while the union was willing to pursue some quid pro quo in the negotiations with the Mayor, it was never going to agree to 13.8 percent. He said that, if 13.8 percent was the bottom line, the answer of the union would have to be no.

Watroba responded to the Mayor's letter on September 3, 1980, stating, inter alia:

We fully recognize our duty to bargain on behalf of all of our members. Our seniority clauses have been bargained with the interest of our total membership in mind. They cannot be cast aside when the very situation they were designed to cover is about to occur. You will recall the City voluntarily withdrew its demands for proportionate layoffs of blacks and whites in the last rounds of negotiations.

.    .    .    .    .

The City must be willing, in the process, to negotiate about all factors leading to the budget shortfalls, including ill-advised, ill-timed promotions, the elimination of artificial quotas, and restraints upon *equal* opportunity. If you, without pre-conditions eliminating areas of bargaining, will personally begin marathon good-faith bargaining designed to settle the contract, rather than enhance images, we are prepared to start at 7:00 p.m. on September 3, 1980, or at your earliest convenience.

The Mayor responded to Watroba's letter the same day indicating his willingness to bargain and to meet with reference to the layoffs. He made the further observations in that letter:

First, in response to your statement that no previous "meaningful proposals were made to avert the layoff" by the City, let me remind you that on April 2, 1980, during negotiations with the DPOA, we proposed that pay rates be reduced to the level of the pay increases that other City employee unions accepted. This would have avoided all police layoffs.

Again, on June 17, the City asked the DPOA to waive retroactive pay adjustments due from July 1977 to December 1978, and to waive the COLA roll-in due July 1, 1980. In return for agreement ot this proposal, the City offered to reduce the scheduled layoff by 440 employees. As you will recall, the DPOA rejected both of these proposals.

Second, I must question the extent of your concern about the impact of the layoffs on affirmative action gains in the Detroit Police Department. The DPOA's brief on economic issues, prepared for the Act 3–12 Arbitration Panel in 1977, said: "The DPOA does not question management's right to determine manpower levels, but questions whether veteran police officers should subsidize new hires." This language makes it apparent to me that the DPOA had no qualms about sacrificing the jobs of new police officers to finance its economic demands.

.    .    .    .    .

In closing, let me remind you that affirmative action as a concept is not negotiable. It is mandated not only by the City Charter, but also by State and Federal law, and by the courts, as well.

It is also my opinion that the duty to implement affirmative action does not stop just because we have found more equitable ways to hire new police officers. Rather, we have a double duty— that we are now challenged to find equi-

table ways to implement the September 5 layoffs.

The fact that we have found ways to remove hiring barriers at the front door does not relieve us of our obligation to find ways to remove comparable barriers at the back door now that the circumstances require it.

In the meantime, the executive board of the DPOA met on September 2. While that meeting was in progress, Lewis Colson, executive director of the Guardians, hand-delivered a letter to Watroba. Watroba testified he left the meeting to receive the letter and to talk to Colson. In that letter, the Guardians called for action other than standing merely on seniority with reference to layoffs. The letter, in pertinent part, said:

> The Guardians are extremely disturbed by the planned layoffs of 690 officers scheduled for September 5, 1980. The reported statistics indicate that these layoffs will have a disproportionate effect on minority and female officers. When considered in connection with the 400 officers laid off in October, there is a real reversal of the progress that has been made to integrate the police force at all levels.
>
> As you know, Mayor Young has indicated he is willing to discuss other options to avert the proposed layoffs. We understand his proposals call for the *temporary* institution of separate seniority lists, or a *temporary* reduction of work hours and pay. We believe that either of these suggestions is reasonable, and we urge you to accept one of them, or at the very least, to negotiate in good faith with the Mayor to avoid the layoffs. As you are aware, prior to the introduction of the City's affirmative action plan for the department the minority representation on the police force was less than 5 percent. Over the last six years, as the direct result of the affirmative action plan, the minority representation rose to over 33 percent prior to the October 1979 layoffs. However, the impending layoffs of 693 police officers will reduce the minority representation to less than 26 percent.
>
> It is common knowledge in our community that the integration of the police force, to the extent is has occurred, has had a profound and positive effect on police and community relations. The wide spread alienation of black Detroit residents from the Police Department has changed. Individual citizens and community groups alike are beginning to identify and work with the police. The affirmative action program has been in effect since 1974. Since that time there has been a 30 percent reduction in crime and, most importantly, no police officer has been killed in the line of duty.
>
> .        .        .        .        .
>
> Finally, we believe the Union is duty bound, by its own constitution and by law, to protect that job security of all its members. Article III, § 2 of the Union's Constitution requires the Union's leadership to promote job security.
>
> Additionally, as the DPOA is the exclusive bargaining agent for all of the police officers, it owes a legal duty to fairly represent *all* officers—black and white, male and female. If the DPOA stands idly by and watches minority and female officers be subject to disproportionate layoffs, when the Mayor has offered reasonable ways to avert this result, the Guardians will believe that the DPOA intends this result. We will, therefore, view this an intentional act by the DPOA to violate the duty of fair representation owed to minority and female members, and we will take appropriate action.

This letter was never answered.

On the eve of the layoffs, September 5, 1980, Watroba met with the Mayor and others in the Mayor's office for approximately three and one half hours. The DPOA at that meeting proposed a "25 and out" plan and the City adoption of a Chrysler model, by which there would be a freeze or a deferral of benefits otherwise due, with some kind of a pay-out at a later date. It also proposed there be discussion of standards and criteria concerning promo-

tions from bargaining units. The union rejected the dual seniority lists, and also the Mayor's 13.8 percent pay reduction proposal. They also rejected a lower figure of either 12 or 12.8 percent. Additionally, Watroba rejected the Mayor's suggestion that the membership be permitted to vote on whether to accept a 13.8 percent reduction or some other lower percentage reduction.

Nothing came of the meeting. The Union would not budge on its opposition to a pay reduction or separate seniority lists, and the layoffs went into effect the next day.

At no time did the union make any reasonable effort to avert the layoffs. This is in stark contrast to the actions taken by the DPOA in 1975 and 1981 when layoffs were threatened and the vast majority of officers who would be laid off were white. See discussion of these concessions *infra.* Here the layoffs affected principally black officers, and no realistic efforts to avert the layoffs were made.

The union's response to the threatened layoffs of 690 officers, which would, with the 1979 layoffs, total one-quarter of their union and one-half of the black membership, was totally perfunctory. No special meetings were called at any level of the union. The union officials who took the stand at trial could not even recall if the layoffs were discussed at the routine, regular meetings which took place during the period. No response at all was given to Colson's letter—it was simply referred to counsel, and the DPOA leadership awaited this lawsuit. No votes regarding any possible compromises were taken at any level of the union, which could have at least allowed the laid-off officers to express their views and test its support in the union. It is this perfunctory behavior of the DPOA officials that breached the duty of

fair representation here, not any per se refusal to make concessions or agree to affirmative action layoffs.

4. *The present day failure to make any serious efforts to assist these black officers.*

It is significant that the 1983 bargaining demands of the union do not in any way address themselves to the recall of laid-off officers. The DPOA contended at trial that some bargaining demands tangentially affect the layoffs, such as the reduction of police reserves, and the demand that there be only one call to any police car at any time, but these demands are so tangential as to have little, if any, effect on layoffs. The actual fact is that the union, even in its 1983 demands, evinced no real interest in getting black laid-off police officers back to work. Again, given the DPOA's history, this Court cannot believe that this behavior would be the same if one-half of its white membership was laid off.

5. *A history of concessions and prompt union action to avert layoffs in 1975 and 1981 when the jobs of white officers were at stake.*

In 1975, a layoff of police officers, most of whom would have been white, was threatened, and litigation was commenced, which was assigned to Judge Damon Keith, then a United States District Judge. Judge Keith mediated a solution. The net result of the mediation was to avert layoffs of police officers, the vast majority of whom would have been white. An agreement was reached that, during a period of 18 months, each member of the bargaining unit would take 14 days off without pay, and would get an additional ten days off with pay, and that these 24 days could be taken off during the 18 month period. Other minor concessions were made, and layoffs were averted.[18]

**18.** During the first 12 months of the agreement, the first time that an officer would call in sick, that officer's sick bank would not be reduced, but rather one of the 10 paid days would be reduced and used in a sick bank as a sick day as opposed to depleting the sick bank. It was further agreed that, with reference to holidays worked, all officers would receive 12 hours compensatory time as opposed to payment for working on holidays, and for a 12 or possibly 13 month period, they were to be paid for less hours of work, so that for every two week pay-period, they would receive 76 hours of pay rather than 80 hours of pay.

In 1981, further layoffs were threatened because of the City's financial condition. The union agreed to a pay freeze to protect the jobs of the officers. At that time, the officers who would have been laid off were largely white officers. In return for the pay freeze, the DPOA obtained improved longevity, better vacation, better dental program, and the elimination of a 55 year old retirement age, so that officers could retire after 25 years of service. It should be noted, however, that this was basically a concession contract, with no wage increases at a time of fairly serious inflation in this country.

The actions of the DPOA in 1975 and 1981, when largely white officers would have been involved in lay offs, resulted in concessions to protect jobs. This activity stands in sharp contrast to its actions in 1979 and 1980 when the layoffs affected principally black officers.

The union argues that the situation was different in 1975 and 1981. The Court recognizes that there are differences. The 1975 solution did not appear to be a very popular one with the City. The 1981 solution took place at a time of great financial distress for the City, and the union was told that the City was on the verge of bankruptcy.

However, these differences do not explain the basic fact that, when white officers were to be laid off, the union did *something;* when the overwhelming majority were blacks, the union did *nothing.* It is not the business of this Court to decide precisely what the DPOA should have done in 1979 and 1980. The duty of fair representation creates no such guidelines. The duty only commands that the union, when racial minorities are involved, behave in a manner that is representative, not perfunctory and passive. This is what the DPOA failed to do here.

The DPOA has offered other explanations for its actions in 1979 and 1980. It must be emphasized that this Court has no role in, nor desire to enter into, the collective bargaining process, and question collective bargaining decisions made by the DPOA in the course of negotiations with the City. The union has a wide range of discretion in bargaining insofar as these efforts are reasonable. *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

Thus, this Court is not concerned with any reasonable activity of the DPOA in collective bargaining, even certain activity which sacrifices the interests of minorities for the majority. This Court is only concerned with activity that is arbitrary, racially discriminatory, and not in good faith. And this Court finds that in its representation of its black members, the DPOA's perfunctory and passive behavior in 1979 and 1980 breached the duty of fair representation.

This finding of liability of the DPOA is not predicated upon any legal finding that its defense of a bona fide seniority system was per se wrong. It is recognized that there have been no prior judicial findings of intentional racial discrimination against the DPOA as there were against the City of Detroit, and it is well recognized by this Court that Title VII protects from liability bona fide seniority systems. *See Teamsters* and *Stotts, supra.* It was the DPOA's action *as a whole,* not the defense of any particular position, that was unreasonable and breached the duty of fair representation here.

There is nothing in *Stotts,* or any other case, that would prevent a union and employer from mutually and voluntarily agreeing to an affirmative action layoff system in the future. Nothing compels a bargaining representative to limit seniority clauses solely to the relative lengths of employment of respective employees. *See Ford Motor Co. v. Huffman, supra. See also Burchfield v. United Steelworkers of America,* 577 F.2d 1018 (5th Cir.1978). Seniority rights are creatures of contract, always subject to modification. Thus, there is no merit to the DPOA's argument that there were legal obstacles to a *voluntary* agreement regarding affirmative action layoffs.

For the reasons given, the Court finds that the DPOA has breached the duty of fair representation owed to its minority members and must respond legally.[19]

The Court finds no liability of the DPOA under the Thirteenth Amendment. It has found no case law applying to the Thirteenth Amendment under the facts of this case, and declines to do so here. The Court finds no reason to consider the claim under 42 U.S.C. § 1981 in light of the result reached here. The Court finds no violation of 42 U.S.C. § 1985(3). *See* n. 14 *supra.*

## V

The Court having determined that the defendant DPOA has breached its duty of fair representation, it now must turn to a consideration of relief.

In determining relief, the Court retains the full measure of its equitable and legal power to fashion a remedy that is just and equitable to all parties.

The Supreme Court in *Steele, supra,* said:

> We conclude that the duty which the statute imposes on a union representative of a craft to represent the interests of all its members stands on no different footing and that the statute contemplates resort to the usual judicial remedies of injunction and award of damages when appropriate for breach of that duty.

323 U.S. at 207, 65 S.Ct. at 234.

In fashioning a remedy, this Court, as a chancellor, does not desire to punish defendants for what they have done in the past, but to fashion a remedy that will insure that in the future the DPOA will adequately represent, as a bargaining agent, all of its members, and will not discriminate against its minority members.

No assessment of damages will be made against the DPOA, but rather, an order will be entered guaranteeing that the black members of the DPOA have their just and fair say in the operation of the union. In this way, positive steps towards preventing a future breach in the duty of fair representation will be taken.

If the black members of the DPOA are given their proper representation in the leadership structure of the DPOA they can, in the future, protect minority members against a breach of the duty of fair representation by the Union. It is this goal that this Court seeks. The Court is only intervening in the internal affairs of the DPOA to the extent necessary to assure adequate representation of black members in the relationship between the DPOA and the City of Detroit.

■ Therefore, the following relief against the DPOA will be ordered: within 12 months of the date of this opinion, all committees of the DPOA, especially grievance and finance, the board of directors, and the executive board shall reasonably reflect the racial composition of the union.

At the end of 12 months, plaintiffs shall notice a hearing before this Court so that the Court can determine if there has been substantial compliance with this order, and a good-faith effort to reach the goals set forth above. At that hearing, the Court will take such action as it deems necessary against the DPOA, if it has failed to comply with this mandate.

## VI

For the reasons given in this opinion, a judgment will issue embodying the following:

1. The previous determination of this Court that the City breached its affirmative obligations to plaintiffs in violation of their

---

**19.** This finding has support in *Brown v. Neeb,* 644 F.2d 551 (6th Cir.1981):

> We find the Union's refusal [to agree on wage reductions] disturbing. Where large numbers of union members scheduled for layoff are members of a racial minority, a union's refusal to take pay cuts to avert layoffs is significant, *prima facia* evidence of racial discrimination. This is especially true in a situation where the laid-off minorities were recently hired under an affirmative action plan and/or where the union has opposed affirmative action.

rights under the Fourteenth Amendment in the layoffs of 1979 and 1980 is reaffirmed.

2. The City of Detroit is ordered to recall all black police officers laid off in the 1979 and 1980 layoffs who desire to return to the force, and who are qualified for police work, within 180 days, and submit a plan to accomplish this to this Court within 30 days.

3. No back pay will be awarded to any recalled officer, but all recalled officers will be entitled to the full seniority they would have had, if they had remained on duty from the time of the layoffs until the time of the recall.

4. The City of Detroit shall not lay off, suspend, or discharge any police officer, except for disciplinary reasons, without the prior approval of this Court. This order will remain in effect until the further order of this Court.

5. Any white police officer laid off in the 1979 and 1980 layoffs who has seniority over any black officer recalled may, within 30 days, petition this Court for consideration of his or her case, and for consideration of his or her recall. The Court expresses no opinion as to the merit of any such claim.

6. The DPOA breached its duty of fair representation under Michigan law in bargaining on behalf of plaintiff police officers.

7. The DPOA is ordered, within 12 months, to remedy its breach of the duty of fair representation by having a reasonable representation of blacks in the leadership structure of the DPOA, including, but not limited to, the board of directors, all committees, and the executive committee. Within 12 months from the date of this opinion, the Court will conduct a further hearing to determine if reasonable representation has been achieved and, if it has not, to determine what remedies the Court will order against the DPOA for its failure to comply with this order.

This opinion shall constitute the findings of fact and conclusions of law required by F.R.C.P. 52(a).