821 F.2d 328
 125 L.R.R.M. (BNA) 2784, 43 Fair
Empl.Prac.Cas. 1786,
43 Empl. Prac. Dec. P 37,286,
45 Empl. Prac. Dec. P 37,659, 55 USLW 2696
 N.A.A.C.P., DETROIT BRANCH; The Guardians, Inc.; Brady
Bruenton; Cynthia Martin; Hilton Napoleon; Sharron
Randolph; Betty T. Roland; Grant Battle; Cynthia Cheatom;
Evin Fobbs; John Hawkins; Helen Poellnitz, on behalf of
themselves and all others similarly situated,
Plaintiffs-Appellees (84-1836, 85-1026, 85-1027),
Cross-Appellants (85-1041),
v.
DETROIT POLICE OFFICERS ASSOCIATION (DPOA); Thomas
Schneider, President of the DPOA; City of Detroit, a
Michigan Municipal Corporation; Mayor Coleman A. Young;
Detroit Police Department; Board of Police Commissioners;
Chief William Hart; Governor William Milliken; and the
Michigan Employment Relations Commission,
Defendants-Appellants (84-1836, 85-1026, 85-1027), Cross-
Appellees (85-1041),
and
Kenneth C. Champagne; Mark Surma; Marsha Dreslinski;
Adela Matias-Rivera, et al., Applicants in
Intervention-Appellants (85-1027).
 Nos. 84-1836, 85-1026, 85-1027 and 85-1041.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 20, 1986.
Decided June 12, 1987.
Rehearing and Rehearing En Banc Denied Aug. 31, 1987.
 
 Walter S. Nussbaum (lead counsel), Mara Kalnins-Ghafari, Donald J. Mooney, Jr., argued, Paxton & Seasongood, Cincinnati, Ohio, Jack F. Fuchs, Farmington Hills, Mich., Frank W. Jackson, Detroit, Mich., Teri L. Hayles, Daniel B. Edelman, argued, Washington, D.C., for defendants-appellants.
 Daune Elston, Thomas Atkins, (lead counsel), argued, Brooklyn, N.Y., Jeanne Miner, Gary Benjamin, James W. McGinnis, Detroit, Mich., for plaintiffs-appellees.
 Diane L. Vaksdal, argued, Mountain States Legal Foundation, Denver, Colo., for applicants in intervention-appellants.
 Before MERRITT, WELLFORD and NORRIS, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 Two questions are raised in this case arising from the layoff of black employees hired under an affirmative action plan. The first question is whether prior judicial approval of a public employer's affirmative action plan forecloses that employer from later laying off recently hired employees who would otherwise be laid off on the basis of seniority under a collective bargaining agreement. This case arises because the City of Detroit laid off 1100 police officers in 1979-80, approximately 75 percent of whom were black. The layoffs occurred under the last-hired, first-fired provision of the City's collective bargaining agreement with the Detroit Police Officers Association.
 
 
 2
 In Bratton v. City of Detroit, this Court upheld a voluntary affirmative action plan providing for the promotion of a black sergeant to every second job opening for lieutenant in the police department of the City of Detroit. See 704 F.2d 878 (6th Cir.) (Bratton I ), modified, 712 F.2d 222 (6th Cir.1983) (Bratton II ), aff'g Baker v. City of Detroit, 504 F.Supp. 841 (E.D.Mich.1980), modifying 483 F.Supp. 930 (E.D.Mich.1979), cert. denied, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). In that case, although we held that the factual and legal basis for the promotional plan was sufficient to justify the City in adopting the plan voluntarily, we specifically and expressly reversed the District Court order which made the plan mandatory. See Bratton II, 712 F.2d at 223.
 
 
 3
 In this case, the District Court, applying the doctrine of collateral estoppel, held that our decision in Bratton forecloses further litigation on the issue of prior discrimination in the police department, and leads to the conclusion that the City could not lay off any police officers as part of a planned reduction in force. See NAACP v. Detroit Police Officers Ass'n, 591 F.Supp. 1194 (E.D.Mich.1984). The net effect of the District Court's order is to mandate that the City may not reduce the staffing and budgetary level of the police department in effect at the time of the order without the prior permission of the court. The District Court enjoined the City from laying off any police officers under the plan because the layoffs reversed the effects of the voluntary affirmative action plan. Based on its collateral estoppel ruling, the District Court ordered reinstatement of all officers previously laid off pursuant to the plan.
 
 
 4
 The City of Detroit and its Mayor, Coleman Young, and the Detroit Police Officers Association appealed the issuance of the injunction preventing any layoffs. The Mayor, the City, and the union argue that the District Court erroneously applied doctrines of estoppel to significantly modify what had previously been a voluntary affirmative action plan.
 
 
 5
 The doctrine of collateral estoppel dictates that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); see generally C. Wright, Law of Federal Courts 678-96 (4th ed. 1983).
 
 
 6
 Before collateral estoppel may be applied to bar litigation of an issue, four specific requirements must be met:
 
 
 7
 (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;[1]
 
 
 8
 (2) determination of the issue must have been necessary to the outcome of the prior proceeding;[2]
 
 
 9
 (3) the prior proceeding must have resulted in a final judgment on the merits;[3] and
 
 
 10
 (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.[4]
 
 
 11
 Applying these principles to the facts of this case, it was proper for the District Court to invoke doctrines of estoppel and judicial admission to preclude the City from denying the facts of prior discrimination that it had earlier demonstrated and conceded. See Baker, 483 F.Supp. 930 (E.D.Mich.1979). However, it was incorrect for the District Court to then rely on these findings as the sole basis for making a very significant modification to the voluntary plan by disallowing any further layoffs until the goals of the plan are met.
 
 
 12
 In Bratton, we merely recognized as a sufficient justification for its voluntary plan the City's own determination that it had discriminated in the past. We therefore held that the City's institution of a voluntary affirmative action plan was constitutionally permissible. See Bratton I, 704 F.2d at 886-90. This is a different issue from whether a constitutional violation has occurred which mandates a court-ordered remedy. See Bratton II, 712 F.2d at 223; Bratton I, 704 F.2d at 902 (Merritt, J., dissenting). It was therefore improper for the District Court to rely solely on the Bratton findings and conclusions to set aside the reverse seniority provision of the collective bargaining agreement. The constitutional and social policies that permit affirmative action do not mandate it. Such a rule would only lead employers to reject voluntary affirmative action at the outset so as not to compromise their flexibility in the future when reductions in force become necessary.
 
 
 13
 The court in Bratton did not impose a legal duty on the City to hire or retain the particular employees being laid off here. Judicial approval of a voluntary affirmative action plan does not create a contract of permanent employment or invalidate or modify a collective bargaining agreement providing for layoffs on the basis of seniority. The District Court erred in reading the doctrine of collateral estoppel to modify a previously voluntary affirmative plan and thereby foreclose application of the bona fide seniority layoff provisions of the collective bargaining agreement.
 
 
 14
 On the second issue presented on appeal, the District Court, in deciding a pendent state claim, held that the Detroit Police Officers Association breached the duty of fair representation it owed to its minority members under Michigan law. This finding was predicated upon the union's "perfunctory and passive" behavior in response to the layoffs at issue in this case. See NAACP v. DPOA, 591 F.Supp. at 1219. The Court found that the breach occurred because the union did not fight the layoffs forcefully or effectively. At the outset we should note what the finding was not predicated upon: There was no finding of intentional discrimination by the union against its members. The District Court stated that the union had not been found guilty of intentional discrimination, and that its defense of the bona fide seniority provision was not improper. Id. The District Court's finding of liability instead stemmed from the union's action "as a whole" in response to the threatened layoffs, not its "defense of any particular position." Id. To remedy this alleged breach of the duty of fair representation, the District Court ordered the union to integrate black officers into its leadership structure within one year.
 
 
 15
 Courts are reluctant to allow the electoral processes of a union to be abridged. In Donovan v. Illinois Education Ass'n, the Seventh Circuit struck down a union's voluntary plan to allocate a certain percentage of its elected offices to minorities where there had been no finding of prior intentional discrimination by the union. See 667 F.2d 638, 640-42 (1982) (applying federal labor laws).
 
 
 16
 The union is concededly the exclusive bargaining agent under state law for all Detroit police officers below the rank of sergeant.[5] Public employees of the political subdivisions of a state are not governed by the federal labor laws. See 29 U.S.C. Sec. 152(2) (1982). Therefore, the laws of Michigan define the permissible contours of the relationship between the union and its members. See Mich.Comp.Laws Sec. 423.201 et seq. (1978).
 
 
 17
 In Goolsby v. City of Detroit, 419 Mich. 651, 660-61 n. 5, 358 N.W.2d 856, 861 n. 5 (1984), the Michigan Supreme Court expressly recognized the union's duty of fair representation under the state's labor law. The Goolsby Court generally adopted the fair representation standard enunciated by the United States Supreme Court in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Under this analysis, the duty of fair representation is comprised of three distinct responsibilities: "(1) 'to serve the interests of all members without hostility or discrimination toward any', (2) 'to exercise its discretion with complete good faith and honesty', and (3) 'to avoid arbitrary conduct'." See Goolsby, 419 Mich. at 664, 358 N.W.2d at 863 (quoting Vaca, 386 U.S. at 177, 87 S.Ct. at 909). A union's failure to comply with any one of the three responsibilities constitutes a breach of its duty of fair representation. Id.
 
 
 18
 The general question facing the Court in Goolsby has a superficial similarity to the issue facing our Court--absent improper motive, when does a union's unexplained failure to act constitute a breach of its duty of fair representation? In Goolsby, the union failed to follow through on grievance proceedings brought on behalf of a group of its members. This failure to further process the grievance was without explanation but there was no evidence of bad faith on the part of the union. The question facing the Court was whether this unexplained failure to act met the third prong of the Vaca standard which prohibits arbitrary conduct.
 
 
 19
 The Goolsby Court held that a union's unexplained failure to process the grievances of its members could constitute arbitrary conduct sufficient to meet the third prong of the test. See 419 Mich. at 679, 358 N.W.2d at 870. The Court further held that no bad faith on the part of the union was necessary to meet the third prong of the test.
 
 
 20
 The question presented in this case differs in one significant respect from that presented in Goolsby. In our case, the District Court held that the union's failure to act forcefully on behalf of its members in response to threatened layoffs constituted a breach of the duty of fair representation. The union's duty to process grievances on behalf of its members, which was at issue in Goolsby, is an essential linchpin of the collective bargaining process. In our case, under Michigan law, a public employer's initial decision to lay off is a permissive subject of bargaining. Local 1277, AFSCME v. City of Center Line, 414 Mich. 642, 665, 327 N.W.2d 822, 831-32 (1982). Therefore, the union had no mandatory duty to act on behalf of its members in response to the threatened layoffs.[6] Absent a duty to act, failure to act forcefully does not breach the union's duty of fair representation. See e.g. B. Gorman, Basic Text on Labor Law 706 (1976).
 
 
 21
 This does not mean that other circumstances may not arise which would create a duty on the part of the union to bargain against threatened layoffs. For example, if federal or state law prohibited the layoffs, or if the voluntary affirmative action plan or the collective bargaining agreement did not permit the layoffs, then the union may have had a duty to bargain against them. In the context of this case, however, we have held that the District Court erred in applying principles of collateral estoppel to create a constitutional obligation on the part of the City to avoid these layoffs. Moreover, the voluntary affirmative action plan did not address layoffs, and the collective bargaining contract between the parties expressly provided for layoffs to be made strictly on the basis of reverse seniority. The District Court specifically found the seniority provision to be bona fide. NAACP v. DPOA, 591 F.Supp. at 1219. For these reasons, based upon the facts set forth in the District Court's opinion, the union was under no special obligation to bargain against these layoffs.
 
 
 22
 The failure to bargain against layoffs could also have been found to be evidence of bad faith or discrimination on the part of the union. However, the District Court did not find that the union was improperly motivated in its reaction to the threatened layoffs. Rather, the District Court held that the union's failure to act alone constituted a breach of the duty of fair representation. Absent a finding of intentional discrimination or other improper motivation, the union's mere failure to bargain forcefully enough in a permissible context does not by itself constitute bad faith or discrimination.
 
 
 23
 The plaintiffs also allege that the union violated 42 U.S.C. Sec. 1981. The District Court did not address this issue. Accordingly, we reverse the District Court's injunctive orders against the City and the union and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); Blonder-Tongue Laboratories, Inc. v. University of Illinois Found., 402 U.S. 313, 323, 91 S.Ct. 1434, 1439, 28 L.Ed.2d 788 (1971); United States v. Smith, 730 F.2d 1052, 1057 (6th Cir.1984); Spilman v. Harley, 656 F.2d 224, 228 (6th Cir.1981)
 
 
 [2]
 See Parklane, 439 U.S. at 326 n. 5, 99 S.Ct. at 649 n. 5; Smith, 730 F.2d at 1057; Spilman, 656 F.2d at 228
 
 
 [3]
 See Blonder-Tongue, 402 U.S. at 323, 91 S.Ct. at 1439; Smith, 730 F.2d at 1057
 
 
 [4]
 See Haring v. Prosise, 462 U.S. 306, 313, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595 (1983); Allen v. McCurry, 449 U.S. at 95, 101, 101 S.Ct. at 415, 418; see generally Restatement (Second) of Judgments Sec. 29 (1982)
 
 
 [5]
 The union was granted this authority by the Public Employment Relations Act, Mich.Comp.Laws Sec. 423.211 (1978), which provides in pertinent part:
 Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment....
 
 
 [6]
 The union remains under a duty to bargain over the impact of the layoff decision on workload and safety. See Center Line, 414 Mich. at 661-66, 327 N.W.2d at 830-32. None the less, this is not at issue in this case