**N.A.A.C.P., DETROIT BRANCH; The Guardians, Inc.; Brady Bruenton; Cynthia Martin; Hilton Napoleon; Sharron Randolph; Betty T. Rolland; Grant Battle; Cynthia Cheatom; Evin Fobbs; John H. Hawkins; Helen Poelnitz, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**DETROIT POLICE OFFICERS ASSOCIATION (DPOA); David Watroba, President; City of Detroit; Coleman A. Young, Mayor; Detroit Police Dept., Board of Police Commissioners; William Hart, Chief; William Milliken, Governor; The Michigan Employment Relations Commission, Defendants–Appellees.**

No. 88–1902.

United States Court of Appeals, Sixth Circuit.

Argued July 31, 1989.

Decided April 9, 1990.

Rehearing and Rehearing En Banc Denied June 18, 1990.

Thomas I. Atkins (argued), Brooklyn, N.Y., for plaintiff-appellant.

Jeanne Mirer, Barnhart & Mirer, Detroit, Mich., for plaintiffs.

Frank Jackson, Terri L. Hayles, City of Detroit Law Dept., Detroit, Mich., Daniel B. Edelman (argued), Yablonski, Both & Edelman, Washington, D.C., Allan D. Sobel, Rubenstein, Isaacs, Lax & Bordman, Southfield, Mich., Walter Nussbaum (deceased) (argued), and Michael A. Lockman, Detroit, Mich., for defendants-appellees.

Before MERRITT, Chief Judge, and KENNEDY, Circuit Judge, and TODD, District Judge.*

MERRITT, Chief Judge.

In a previous appeal in this action, our Court published on June 12, 1987, an opinion, *NAACP v. Detroit Police Officers Ass'n*, 821 F.2d 328, 333 (6th Cir.1987), holding that a purely *voluntary* affirmative action plan instituted by Mayor Young and the City designed to increase minority representation in the Detroit Police Department could not override the last-hired, first-fired layoff provision of the Union's collec-

---

* The Honorable James D. Todd, United States District Judge for the Western District of Tennessee, sitting by designation.

tive bargaining agreement with the City.[1] We held further that because the Union had not engaged in intentional discrimination, its failure to bargain forcefully against the layoffs made for budgetary reasons did not breach its duty of fair representation. The appeal in the previous case was from a ruling by the District Court that the voluntary plan alone by its own force required a finding of liability against the City and Mayor Young, and an injunctive order disallowing them from laying off 900 black police officers until the plan goals had been met. *See NAACP v. Detroit Police Officers Ass'n,* 591 F.Supp. 1194 (E.D.Mich.1984). We reversed the injunctive orders below and remanded the action for further proceedings.

## I.

On remand, after conducting proceedings on the motions of the parties for summary judgment, the District Court declared the issues moot and dismissed the case. The court did not reach the defendants' claim that the budgetary layoffs of the black officers were protected under § 703(h) of Title VII because they were made pursuant to a bona fide seniority plan.[2] Plaintiffs have now appealed the mootness ruling. We reverse the District Court's decision that the case is moot but conclude that the defendants are protected from liability because the layoffs occurred pursuant to a bona fide seniority plan insulated under § 703(h).

The District Court considered on remand the City's motion for entry of judgment on plaintiffs' § 1983 claim, and the Union's motion for summary judgment on plaintiffs' §§ 1983 and 1981 claims. The court first granted the Union's § 1983 motion and denied the others, reasoning that the trial requested by plaintiffs was not precluded by this Court's determination in *NAACP v. Detroit Police Officers Ass'n,* 821 F.2d 328, that prior discrimination in the police department could not be established solely from our previous approval of a purely voluntary affirmative action plan. Without conducting a trial, the District

1. This case comes to us with a long procedural history. Plaintiffs initiated this action on September 30, 1980, against Mayor Coleman A. Young, the local police union called the Detroit Police Officers Association, the City of Detroit, and other Detroit municipal officials and agencies. In essence, plaintiffs made two claims concerning layoffs that the Mayor ordered because of budget constraints:

    1) that the layoffs ordered by Mayor Young of approximately 900 black police officers pursuant to a layoff provision in the collective bargaining agreement were discriminatory in light of the unmet remedial obligation of the City and the Police Department to undo the effects of past racial discrimination; and

    2) that the Union engaged in racial discrimination and breached its duty of fair representation by failing to actively oppose the layoffs of the black police officers ordered by Mayor Young.

    Plaintiffs sought declaratory relief, reinstatement, nondiscriminatory assignments, restoration of seniority, back pay, out-of-pocket expenses, and an injunction against future layoffs.

    After four years of proceedings in the court below, the District Court, applying collateral estoppel, held that our decision in *Bratton v. City of Detroit,* 704 F.2d 878 (6th Cir.1983) (*Bratton I*) (City's voluntary affirmative action plan regarding police department promotions to sergeant upheld), *modified,* 712 F.2d 222 (6th Cir. 1983) (*Bratton II*), *aff'g Baker v. City of Detroit,*

504 F.Supp. 841 (E.D.Mich.1980), *modifying Baker v. City of Detroit,* 483 F.Supp. 930 (E.D. Mich.1979), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984), automatically foreclosed further litigation on the issue of prior discrimination in the police department and precluded the City from laying off any police officers under Mayor Young's planned reduction in force. *See NAACP v. Detroit Police Officers Ass'n,* 591 F.Supp. 1194 (E.D.Mich.1984). Because it perceived that the layoffs reversed the effects of the voluntary affirmative action plan, the District Court enjoined the City from laying off any police officers in accordance with the seniority provisions of the collective bargaining agreement without prior court approval, and ordered reinstatement of all officers previously laid off. The District Court further found that the DPOA had breached its duty of fair representation by not forcefully fighting the layoffs. *Id.* at 1219.

2. Title VII, § 703(h), as set forth in 42 U.S.C. § 2000e–2(h), provides in pertinent part:

    Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate....

Judge found that "[e]ven though [the District] Court does not ascribe racial animus to the Mayor and his administration," "race was a motivating factor in the City's action to layoff black officers." *NAACP v. Detroit Police Officers Ass'n,* 676 F.Supp. 790, 795 (E.D.Mich.1988) (citing *NAACP v. Detroit Police Officers Ass'n,* 591 F.Supp. at 1202). On the plaintiffs' claim against the Union, the District Judge first recognized that we concluded on the first appeal that he had found no intentional discrimination or other improper motivation in the Union's reaction to the threatened layoffs. But again, without conducting a trial, the District Judge, in denying the Union's motion for summary judgment, found that his findings in *NAACP v. Detroit Police Officers Ass'n,* 591 F.Supp. 1194, "were tantamount to a finding of intentional discrimination...." *NAACP v. Detroit Police Officers Ass'n,* 676 F.Supp. at 797.

After denying defendants' motions for summary judgment, the court ordered briefing on whether plaintiffs' claims had been mooted by events occurring after the injunctive orders had been issued.

█ Because all the officers laid off had been recalled with retroactive seniority, he concluded that plaintiffs' claims against the City were moot. This conclusion rested on the District Judge's observation that the Union membership had become predominantly black, a fact enabling black police officers to protect themselves through their voting power and the opportunity to enter Union leadership. It is this ruling that plaintiffs now appeal.

In dismissing the case, the District Judge said that even though this Court had invalidated his injunctive orders the action was moot because "[e]verything the [District] Court sought to accomplish in its original judgment ... [by the injunction] has been accomplished." *NAACP v. Detroit Police Officers Ass'n,* 685 F.Supp. 1004, 1007 (E.D.Mich.1988). Specifically, the District Court reasoned that by 1988 all of the officers laid off in 1979 and 1980 had been

recalled with full seniority rights, thus leaving no case or controversy between plaintiffs and the City. In addition, since completing the recall in 1985, the City had hired 1,290 new officers. The court also held that since the majority of the membership at the DPOA was now comprised of blacks and other minorities, these minorities had acquired the ability to protect themselves through intra-union political action, thus rendering moot the plaintiffs' claim against the DPOA.

This ruling was erroneous. First, the fact that the District Court has accomplished the goals of its own injunctive order, later reversed as having no basis in law, does not render a case moot. Second, assuming for the moment that the plaintiffs had a viable § 1983 claims against the City or the Union for the 1979–80 layoffs, the appropriate remedy would require more than mere recall and retroactive seniority. It would include the determination of other benefits such as backpay and out-of-pocket costs incurred by the laid-off police officers. Such an interest has been recognized as a "concrete interest in the outcome of the litigation." *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 571, 104 S.Ct. 2576, 2584, 81 L.Ed.2d 483 (1984). Third, minority police officers' majority membership in the Union does not "without more" translate into the ability to protect themselves against discriminatory action by the leadership. Rather, their ability to protect themselves depends on factors such as the Union's organizational structure and could not be evaluated in the abstract without further inquiry. In light of these factors, including the Supreme Court's holding in *Stotts,* we conclude that the controversy was not moot.

II.

Our inquiry may not end here, however. The defendants moved the District Court for dismissal of the case on alternative grounds. Because, as defendants contended in the court below,[3] the plaintiffs' case is

---

**3.** In their motions and supporting briefs, the Union claimed that § 703(h) of Title VII protected it from liability. *See* DPOA's Brief in Support of Motion for Summary Judgment ("[Section] 703(h) of Title VII, 42 U.S.C. 2000e–2h insulates bona-fide seniority systems from at-

based on a fundamentally erroneous legal theory, we conclude that the case must be dismissed.

In their original complaint, plaintiffs claimed that defendants engaged in discriminatory employment practices that violated the Thirteenth and Fourteenth Amendments to the Constitution, post-Civil War civil rights acts now codified at 42 U.S.C. §§ 1981, 1983 and 1985(3), and Titles VI and VII [4] of the Civil Rights Act of 1964. On this appeal, plaintiffs have preserved only their claims under 42 U.S.C. §§ 1981 and 1983. These claims are barred by § 703(h) of Title VII.

Title VII is a remedial statute, designed "to assure equality of employment opportunities...." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). The Act was designed to bar not only overt employment discrimination, "but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). "Thus, the Court has repeatedly held that a prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 349, 97 S.Ct. 1843, 1861–62, 52 L.Ed.2d 396 (1977).

The Act's treatment of seniority systems, however, establishes an exception to liability for employment discrimination based on race. From the *Teamsters* case on, the Supreme Court has recognized that were it not for Title VII's § 703(h) exception, last-hired, first-fired seniority plans would be invalid under the *Griggs* rationale. *Id.; see Lorance v. AT & T Technologies, Inc.*, — U.S. —, 109 S.Ct. 2261, 2265, 104 L.Ed.2d 961 (1989) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113 (1977)) ("[S]eniority systems ... are afforded special treatment under Title VII"); *see also Hardison*, 432 U.S. at 79, 97 S.Ct. at 2274 ("Collective bargaining ... lies at the core of our national labor policy, and seniority provisions are universally included in these contracts"). Special treatment for seniority systems strikes a balance between the interests of those protected against discrimination by Title VII and those who work—perhaps for many years—in reliance upon the validity of a facially lawful seniority system. *Lorance*, 109 S.Ct. at 2265.

▪ The provision that exempts seniority plans from attack under Title VII, section 703(h), as set forth in 42 U.S.C. § 2000e–2(h), provides in pertinent part:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system....

Congress included within the sentence quoted above a proviso that limits to some extent the protection extended to, *inter alia*, "bona fide seniority system[s]": [5]

---

tack through civil rights statutes...."). The City raised the issue as well, relying on the bona fide seniority plan as legal justification for the layoffs. *See* City Defendants' Motion for Entry of Judgment ("[T]he Sixth Circuit determined that the City Defendants acted lawfully and constitutionally in making layoffs in 1979 and 1980 pursuant to the *bona fide* seniority provision...."); Memorandum of Points and Authorities in Support of City Defendants' Motion for Entry of Judgment ("[T]he Sixth Circuit's opinion ... upheld the 1979 and 1980 layoffs ... made pursuant to a *bona fide* seniority provision, as lawful and constitutional."). The District Judge ignored the defendants' § 703(h) defense, and his ruling on defendants' motions for summary judgment failed to discuss the issue.

**4.** Although plaintiffs now say they did not assert a Title VII claim in this case, their complaint belies that assertion:

The violations of law in Counts I, II, and III violate the national policy declaration against discrimination in employment articulated by Congress in Title VII of the Civil Rights Act of 1964.

Plaintiffs' Complaint, Count IV.

**5.** Title VII does not define the term "seniority system," and no comprehensive definition of the phrase emerges from the legislative history of § 703(h). *See* 110 Cong.Rec. 1518, 5423, 7207, 7213, 7217, 12,723, 15,893 (1964). The example of a seniority system most frequently cited in the congressional debates was one that provided that the "last hired" employee would be the

provided that such differences are not the result of an intention to discriminate....

Section 703(h) is not an affirmative defense to the conduct described as illegal in Title VII. *See Lorance*, 109 S.Ct. at 2267. Rather, it has been regarded as a definitional provision, *id.*, which " 'delineates which employment practices are illegal and thereby prohibited and which are not.' " *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 559, 97 S.Ct. 1885, 1889–90, 52 L.Ed.2d 571 (1977) (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 758, 96 S.Ct. 1251, 1261, 47 L.Ed.2d 444 (1976)). In determining which seniority systems are legal under Title VII, that is, which are "bona fide" and thus not precluded by the proviso, the Supreme Court has consistently held that under subsection (h), a showing of disparate impact is insufficient to invalidate a seniority system, even though the result may be to perpetuate pre- or post-Act [6] discrimination. In the Court's view, "the unmistakable purpose of § 703(h)," *Teamsters*, 431 U.S. at 352, 97 S.Ct. at 1863, was to allow employers and unions routinely to apply bona fide seniority systems even though the employer's discriminatory hiring practices may have resulted in whites having greater seniority than blacks. *See, e.g., Stotts*, 467 U.S. at 587, 104 S.Ct. at 2592 (O'Connor, J., concurring) ("Title VII affirmatively protects bona fide seniority systems, including those with discriminatory effects on minorities."); *American Tobacco Co. v. Patterson*, 456 U.S. 63, 65, 102 S.Ct. 1534, 1535–36, 71 L.Ed.2d 748 (1982) (under § 703(h), discriminatory impact alone will not invalidate otherwise valid system); *Hardison*, 432 U.S. at 82, 97 S.Ct. at 2276 ("[A]bsent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences."); *Teamsters*, 431 U.S. at 350, 97 S.Ct. at 1862 (although Title VII violation may be established by facially neutral practices that freeze prior discrimination, "both the literal terms of § 703(h) and the legislative history of Title VII demonstrate that Congress considered this very effect of many seniority systems and extended a measure of immunity to them."); *White v. Colgan Elec. Co.*, 781 F.2d 1214 (6th Cir.1986) (inverse layoff procedure controls even when it retards goals of consent decree); *see also* 110 Cong.Rec. 7207, 7213, 7217 (1964) (Title VII has no effect on established seniority rights).

In order to avoid dismissal, therefore, the plaintiffs' challenge to a seniority system under Title VII must allege facts which, if true, would make out a case of discriminatory intent. *See Lorance*, 109 S.Ct. at 2265 (successful claim depends on proof of intentionally discriminatory adoption of facially lawful system); *Pullman–Standard v. Swint*, 456 U.S. 273, 289, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982) ("Differentials among employees that result from a seniority system are not unlawful employment practices unless the product of an intent to discriminate."); *California Brewers Ass'n v. Bryant*, 444 U.S. 598, 610–11, 100 S.Ct. 814, 821–22, 63 L.Ed.2d 55 (1980) (remanding to district court to test whether system

---

"first fired." *Id.; see California Brewers Ass'n v. Bryant*, 444 U.S. 598, 605 n. 10, 100 S.Ct. 814, 819 n. 10, 63 L.Ed.2d 55 (1980) (requirement under collective bargaining agreement that temporary employee must work at least 45 weeks in a year before claiming benefits attending permanent-employee status *is* a "seniority system" within § 703(h)). In the area of labor relations, "seniority" is a term that connotes length of employment. A "seniority system" is a scheme that allots to employees ever improving employment rights and benefits as their relative lengths of permanent employment increase. *Id.* The principal feature of any and every seniority system is that preferential treatment is dispensed on the basis of some measure of time served in employment. *Id.*

Given the lengthy legislative history and comprehensive discussions found in Supreme Court opinions on the topic, it is clear that the last-hired, first-fired provision before us is a "seniority system" within the meaning of subsection (h).

6. Any doubt over whether § 703(h) protects discriminatory systems applied or *adopted* after the enactment of Title VII was settled in *American Tobacco Co. v. Patterson*, 456 U.S. 63, 75–76, 102 S.Ct. 1534, 1540–41, 71 L.Ed.2d 748 (1982), which held that it does. The majority's position in *American Tobacco* was anticipated by the Court in *Teamsters*, 431 U.S. at 348 n. 30, 352, 97 S.Ct. at 1861 n. 30, 1863, and *Evans*, 431 U.S. at 558, 97 S.Ct. at 1889.

was bona fide or whether differences in employment conditions it produced resulted from purposeful racial discrimination); *Evans*, 431 U.S. at 560, 97 S.Ct. at 1890 ("Since respondent does not attack the bona fides of [the employer's] seniority system, and since she makes no charge that the system is intentionally designed to discriminate because of race ... [or] sex, ... § 703(h) [defeats her claim].").

## III.

■ Neither Mayor Young, the City, nor the Union expected the layoffs to affect white and black officers equally. The defendants knew that enforcement of the seniority plan would have a discriminatory impact on newly hired black officers. This type of discrimination, however, is congressionally immunized by § 703(h) and by the decisions of the Supreme Court:

Congress was well aware in 1964 that the overall purpose of Title VII, to eliminate discrimination in employment, inevitably would, on occasion, conflict with the policy favoring minimal supervision by courts and other governmental agencies over the substantive terms of collective-bargaining agreements. Section 703(h) represents the balance Congress struck between the two policies, and it is not this Court's function to upset that balance.

*American Tobacco*, 456 U.S. at 76–77, 102 S.Ct. at 1541–42 (citation and footnote omitted).

Of course, § 703(h) and its proviso does not immunize *all* seniority systems from attack under the civil rights statutes. It refers only to "bona fide" systems. As the Supreme Court has stated:

Significant freedom must be afforded employers and unions to create differing seniority systems. But that freedom must not be allowed to sweep within the ambit of § 703(h) employment rules that depart fundamentally from commonly accepted notions concerning the acceptable contours of a seniority system, simply because those rules are dubbed "seniority" provisions or have some nexus to an arrangement that concededly operates on

the basis of seniority. There can be no doubt, for instance, that a threshold requirement for entering a seniority track that took the form of an educational prerequisite would not be part of a "seniority system" within the intendment of § 703(h).

*California Brewers Ass'n*, 444 U.S. at 608–09, 100 S.Ct. at 821.

Whether last-hired, first-fired seniority provisions are bona fide was answered at the legislative hearings on Title VII. *See* 110 Cong.Rec. 1518, 5423, 7202, 7213, 7217, 12,723, 15,893 (1964). During the congressional debate on § 703(h), Senator Clark placed in the Congressional Record a Justice Department statement, later endorsed by the Supreme Court, which stated:

It is perfectly clear that when a worker is laid off ... because under established seniority rules he is 'low man on the totem pole' he is not being discriminated against because of his race. Of course, if the seniority rule itself is discriminatory, it would be unlawful under title VII. If a rule were to state that all Negroes must be laid off before any white man, such a rule could not serve as the basis for a discharge subsequent to the effective date of the title.... But, in the ordinary case, assuming that seniority rights were built up over a period of time during which Negroes were not hired, these rights would not be set aside by the taking effect of title VII. Employers and labor organizations would simply be under a duty not to discriminate against Negroes because of their race.

*Franks*, 424 U.S. at 760 n. 16, 96 S.Ct. at 1262 n. 16 (quoting 110 Cong.Rec. 7207 (1964)).

Therefore, in analyzing the scope of subsection (h) and its proviso in light of the pertinent Supreme Court cases and the legislative history of § 703(h), we conclude that in order to prevail, a plaintiff must show either that the employer's practice is not a seniority system or part of a seniority system, or that the seniority system is not bona fide. A seniority system is not bona fide if one of the following criteria is met: 1) that the seniority system was adopted or

negotiated with a discriminatory motivation or purpose; or 2) that the seniority system was administered in an irregular or arbitrary way with intent to harm members of a protected class.

## IV.

■ In the instant case, plaintiffs do not claim that the last-hired, first-fired provision to which the Union and the City agreed in 1967 as part of their first collective bargaining agreement, was not a seniority plan or part of a seniority plan. Nor have they at any stage of this litigation challenged the bona fides of the plan, Supplemental Brief for Plaintiffs–Appellants at 14 ("Plaintiffs throughout have not questioned whether the seniority system was bona fide...."), or that the plan met any of the criteria listed above as evidence that a plan is not bona fide. Nor do plaintiffs contend that the same plan was readopted subsequently by Mayor Young, the City, or the Union for the purpose of discriminating against blacks, *see NAACP v. Detroit Police Officers Ass'n*, 591 F.Supp. at 1219, or that its layoff provisions were administered in an irregular or arbitrary way in order to harm black officers. *See id.* at 1202; Plaintiffs' Complaint ¶ 6, at 22 (failure to modify seniority plan is facially neutral but discriminatory in *effect*).

Instead, plaintiffs argue only that Mayor Young and the City "strictly followed" the provision, and that the Union refused to *modify* the provision in the collective bargaining agreement when warned that the clause would require the layoff of minorities recently hired under the City's affirmative action plan. Plaintiffs' Complaint ¶¶ 36–37, at 14–15; *id.* ¶ 1(c), at 27. Their claim that the seniority plan, by "requir[ing] officers with the least seniority to be laid off first," "perpetuat[ed] the racially discriminatory impact of the previous illegal exclusion of minorities from the police force," *id.* ¶ 61, at 18; *see also id.* ¶ 4, at 22, describes the type of Title VII discrimination generally prohibited by *Griggs* but specifically immunized according to Supreme Court interpretations of § 703(h) discussed above.

Little would be left of *Teamsters* if the results of the normal operation of a concededly bona fide seniority system could establish racial discrimination. *See Teamsters*, 431 U.S. at 352, 97 S.Ct. at 1863; *see also California Brewers Ass'n*, 444 U.S. at 600, 100 S.Ct. at 816. In such a case the employer would be found liable not for present racial discrimination but for complying with a seniority system. Such a ruling would be plainly inconsistent with the dictates of § 703(h), both on its face and as interpreted in the decisions of the Supreme Court.

## V.

On facts similar to those before us, the Supreme Court's decision in *Stotts* makes the same essential point as the cases described above: Section 703(h) will have the effect of preserving some prior discrimination—an effect that contracting parties are aware of and intend when they enter into such agreements. But the congressional purpose in adopting § 703(h) was to give such contracts priority over plans which alter seniority through racially based layoffs. In *Stotts*, the City of Memphis had adopted an affirmative action plan by consent decree requiring an increase in the proportion of minority employees in its fire department. As in Detroit, budgetary cuts led to layoffs, under which many of the black employees who had been hired pursuant to the consent decree would have been laid off first. The Court held that the District Court lacked the power to enforce a consent decree requiring layoffs in conflict with the bona fide seniority provision of the collective bargaining agreement. In so doing, the Court rejected the argument that

> because the City was under a general obligation to use its best efforts to increase the proportion of blacks on the force, it breached the decree by attempting to effectuate a layoff policy reducing the percentage of black employees in the Department even though such a policy was mandated by the seniority system adopted by the City and the Union.

*Stotts,* 467 U.S. at 573–74, 104 S.Ct. at 2585. The Court concluded that neither the decree nor the parties contemplated that the City would "simply disregard its arrangements with the Union." *Id.* at 574, 104 S.Ct. at 2585. Because the District Court's order enjoining the City from layoffs that would decrease black membership in the department conflicted with § 703(h), and because the District Court had found that the layoff proposal was not adopted with the purpose or intent to discriminate on the basis of race, the action of the District Court enjoining the City from applying its seniority system in making the layoffs was reversible error. *Id.* at 579–83, 104 S.Ct. at 2588–90.

The seniority provision in this case, which plaintiffs challenge on the same grounds, must be upheld for the same reasons. Neither case involved a claim or finding that the seniority plan was adopted or imposed with a discriminatory purpose. Likewise, neither the consent decree in *Stotts* nor the voluntary affirmative action plan here provided for or suggested any departure or intent to depart from the City's collective bargaining agreement with the Union. *NAACP v. Detroit Police Officers Ass'n,* 821 F.2d at 332–33.

It should be noted that the Supreme Court declined to enforce a judicially approved consent decree so as to reverse the effects of layoffs under a bona fide seniority plan. Likewise, we may not enforce the purely *voluntary* plan in order to reverse the effects of the bona fide seniority plan here. We thus are barred by *Stotts* from interpreting the voluntary affirmative action plan before us to require the City to disregard the seniority provisions of the collective bargaining agreement, and hold that plaintiffs' claims should have been dismissed below as a matter of law.[7]

Absent a finding of intentional discrimination under the proviso to § 703(h), we may not reverse or enjoin the operation of a bona fide seniority plan that Congress intended to validate and protect when it passed § 703(h). Congress in so doing acted pursuant to its enforcement powers under section 5 of the Fourteenth Amendment.[8] *See Fullilove v. Klutznick,* 448 U.S. 448, 472–73, 100 S.Ct. 2758, 2771–72, 65 L.Ed.2d 902 (1980) (plurality opinion) ("[W]e are bound to approach our task with appropriate deference to the Congress, a co-equal branch charged by the Constitution with the power to 'provide for the . . . general Welfare of the United States' and 'to enforce, by appropriate legislation,' the equal protection guarantees of the Fourteenth Amendment.") (citations omitted); *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828 (1966) ("Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment."). No court has held, and plaintiffs do not contend, that § 703(h) is unconstitutional. Thus, it must be applied to validate and protect the bona fide seniority plan at issue in this case and the layoffs and recalls that occurred under it.

## VI.

Although plaintiffs contend that the protections granted to bona fide seniority

---

7. Plaintiffs rely on *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality opinion), in which the Court held that a one-for-one promotion requirement to redress past and present discrimination against black state troopers in Alabama withstood strict scrutiny analysis under the Fourteenth Amendment. *Paradise* did not involve layoffs under a bona fide seniority plan protected by § 703(h). It thus is inapposite in that it fails to test the validity of an inverse seniority layoff plan like the one at issue here.

In his plurality opinion in *Paradise,* Justice Brennan emphasized another aspect of the distinction between hiring and promotions and layoffs. He reasoned that the one-for-one requirement in *Paradise* was less burdensome than the layoff provision in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), which was invalid because it required the discharge of more senior white employees in favor of less senior blacks. *See Paradise,* 480 U.S. at 182–83, 107 S.Ct. at 1073 (Brennan, J.); *id.* at 188–89, 107 S.Ct. at 1076 (Powell, J., concurring).

8. "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

systems under § 703(h) apply only to claims brought under Title VII, we decline to read Congress's earlier, more general pronouncements in §§ 1981 and 1983 from the Civil Rights Act of 1870 to undermine the force of its later specific declarations of civil rights policy regarding bona fide seniority plans in § 703(h) of the Civil Rights Act of 1964. Basic principles of statutory construction dictate this result:

> General and special acts may be in pari materia. If so, they should be construed together. Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling.... Where the special statute is later it will be regarded as an exception to or qualification of the prior general one....

*Sutherland Statutory Construction* § 51.05, at 499–500 (N. Singer ed. 1984) (footnotes omitted). The Supreme Court has consistently endorsed this canon of construction. *See, e.g., Brown v. General Servs. Admin.*, 425 U.S. 820, 834, 96 S.Ct.

1961, 1968–69, 48 L.Ed.2d 402 (1976) ("In a variety of contexts the Court has held that a precisely drawn, detailed statute preempts more general remedies."); *Preiser v. Rodriguez*, 411 U.S. 475, 489–90, 93 S.Ct. 1827, 1836–37, 36 L.Ed.2d 439 (1973) (although § 1983 by its terms was literally applicable to prisoners' actions, challenges to fact or duration of imprisonment appropriately lie only under habeas corpus, the "more specific act").[9] Inherent in the Court's admonition that statutes such as those before us be read *in pari materia* is its recognition that Congress passed all three Acts pursuant to its enforcement powers under § 5 of the Fourteenth Amendment. Title VII, in addition to being enacted nearly a century later, devotes 27 pages of the United States Code to a detailed treatment of employment discrimination. In drafting §§ 1981 and 1983, on the other hand, Congress conferred on all citizens, in two paragraphs drafted in general terms, equal rights "to make and enforce contracts," (§ 1981) and a private right of action to redress state-sponsored deprivations of civil rights (§ 1983).

Assuming without deciding that plaintiffs set forth colorable claims against the Union under § 1981[10] and against the City and city officials under § 1983,[11] we decline

---

**9.** The Court frequently has held that a narrowly tailored employee compensation scheme preempts the more general tort recovery statutes. *E.g., United States v. Demko*, 385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966) (18 U.S.C. § 4126; Federal Tort Claims Act); *Patterson v. United States*, 359 U.S. 495, 79 S.Ct. 936, 3 L.Ed.2d 971 (1959) (Federal Employees' Compensation Act; Suits in Admiralty Act); *Johansen v. United States*, 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051 (1952) (Federal Employees' Compensation Act; Public Vessels Act).

**10.** Plaintiffs' contention that the Union's failure to protect black officers from layoffs may not state a claim according to the Supreme Court's most recent interpretation of § 1981, which narrowed the statutory breadth of the phrase "to make and enforce contracts." *See Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). There, the Court held that "post-formation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII." *Id.*

109 S.Ct. at 2373. Further, the Court limited the right to enforce contracts to "conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." *Id.*

Because plaintiffs in our case seek relief under § 1981 for post-formation conduct by the Union, and do not claim that their right to invoke the legal process has been hindered, *Patterson* may preclude their § 1981 action altogether. In light of our understanding of the impact of § 703(h) on § 1981, however, we need not reach the question of how *Patterson* might affect plaintiffs' § 1981 claim.

**11.** Likewise, plaintiffs' § 1983 claim, grounded in the notion that the inverse layoff plan and procedure deprived the laid-off black police officers of equal protection of the laws under the Fourteenth Amendment, also may be without merit by virtue of previous decisions rendered in this litigation. We already have held that the City's institution of a voluntary affirmative action plan, based on the City's own determination that it had discriminated in the past, was constitutionally permissible but did not mandate a court-ordered remedy tantamount to a

to endorse plaintiffs' claim that Title VII's legislative protection of bona fide seniority plans can be evaded simply by characterizing an action otherwise falling within the parameters of Title VII as a § 1981 or § 1983 suit. Congress did not intend that its detailed remedial scheme constructed in Title VII be circumvented through pleadings that allege other causes of action under general statutes.

Although the Supreme Court has recognized that Congress did not, with the passage of the Civil Rights Act of 1964 and its 1972 amendments, intend to repeal existing statutes in the civil rights field, or make Title VII the exclusive remedy in all employment discrimination contexts,[12] *see Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (timely filing of Title VII action does not toll statute of limitations period applicable to § 1981 action brought on same facts) and *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 49, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147 (1974) (Title VII action not forfeited when plaintiff first pursues arbitration of grievance under collective bargaining agreement), it also has declined to permit artful pleading to avoid both the requirements and consequences of a Title VII action by any other name. *See Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (post-formation conduct more naturally governed by state contract law and Title VII than by § 1981); *Great American Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 375–76, 99 S.Ct. 2345, 2350–51, 60 L.Ed.2d 957 (1979) (section 1985(3), which creates no substantive rights, cannot be used to bypass administrative process of Title VII); *Brown*, 425 U.S. at 828–29, 96 S.Ct. at 1965–66 (congressional intent in 1972 amendments was, *inter alia*, to create

exclusive judicial scheme for redress of federal public employment discrimination, thus distinguishing *Johnson*, which applies only to private employment discrimination).

Although the Supreme Court has yet to address directly the relationship between § 703(h) and the earlier civil rights statutes, our decision to read these overlapping provisions *in pari materia* is reinforced by the decisions of other courts of appeals. *See, e.g., Chance v. Board of Examiners & Bd. of Educ.*, 534 F.2d 993, 998 (2d Cir. 1976) ("Congress has clearly placed its stamp of approval upon seniority systems in 42 U.S.C. § 2000e–2"; "[t]hat plaintiffs herein are proceeding under 42 U.S.C. §§ 1981, 1983 does not render defendants' seniority system any more susceptible to attack."), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); *Watkins v. United Steel Workers of America*, 516 F.2d 41, 49–50 (5th Cir.1975) (although § 1981 prohibits some employment practices not unlawful under Title VII, provisions of collective bargaining agreement are valid under § 703(h) and do not violate § 1981); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1191–92 n. 37 (5th Cir.1978) ("[T]he protection[s] accorded bona fide seniority systems by section 703(h) apply whether suit is brought under Title VII or section 1981."), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 n. 3 (5th Cir.1980) ("No chameleon-like change in the nature of the relief is experienced simply because it is sought under sister provisions in the federal statutes."); *Waters v. Wisconsin Steel Works*, 502 F.2d 1309, 1320 n. 4 (7th Cir. 1974) ("Having passed scrutiny under ... Title VII, the employment seniority system utilized by Wisconsin Steel is not violative of 42 U.S.C. § 1981."), *cert. denied*, 425

permanent contract of employment. *See NAACP v. Detroit Police Officers Ass'n*, 821 F.2d at 331; *Bratton II*, 712 F.2d at 223; *see also Bratton I*, 704 F.2d at 902 (Merritt, J., dissenting). Accordingly, plaintiffs' § 1983 claim could well be precluded by the "law of the case." Again, however, as with plaintiffs' § 1981 claim against the Union, we believe that § 703(h) insulates the City and its officials from liability under § 1983, and therefore need not decide

whether plaintiffs state a valid claim under the latter.

12. In drafting the Equal Employment Opportunity Act of 1972, which extended the protections of Title VII to public employment contexts, the Senate rejected an amendment that would have deprived a claimant of any right to sue under § 1981. *See* 118 Cong.Rec. 3371–73 (1972).

U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976); *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1348–49 (11th Cir.1983) (close relationship between Title VII and § 1981 leads to conclusion that § 703(h) applies to § 1981 claims); *Larkin v. Pullman–Standard Div., Pullman, Inc.*, 854 F.2d 1549, 1575 n. 41 (11th Cir.1988) (immunity created by § 703(h) extends to § 1981 claims).

No case in our Court has previously examined the § 703(h) issue presented here. We have, however, interpreted other specific provisions of Title VII as limitations upon a § 1983 cause of action. *See Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199 (6th Cir.1984). It would be anomalous, we said, to permit plaintiffs to bypass the administrative procedures of Title VII simply by proceeding under § 1983. *Id.* at 1204. We reserved ruling on the relationship between § 1981 and Title VII, however. Although *Day* suggests that Title VII and § 1981 are not mutually exclusive remedies in general, it does not discuss whether § 703(h) may protect bona fide seniority plans attacked under other civil rights statutes that pre-date Title VII.

## VII.

The plaintiffs neither state nor offer any facts or claim in their pleadings or in evidentiary material offered on summary judgment on the basis of which, if true, a federal court could hold that the seniority system at issue is barred by § 703(h) of Title VII. Plaintiffs' theory of liability is without merit. Section § 703(h) governs and protects the seniority-based layoffs by Mayor Young, the City, and the Union under the bona fide seniority plan negotiated as part of the collective bargaining agreement between the City and the Union.

---

**13.** Rule 12(b) states in pertinent part:
> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56....

Fed.R.Civ.P. 12(b).

The District Court's erroneous judgment that the cause is moot is vacated and set aside.

The case is remanded to the District Court with instructions to dismiss the complaint, as supplemented by additional factual allegations and evidentiary material in motions and other documents in the record, for failure to state a claim under Rules 12(b) and 56 of the Federal Rules of Civil Procedure.[13]

---

Rule 56 states in pertinent part:
> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).